IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 19, 2005 Session

## RIVERSIDE SURGERY CENTER, LLC, ET AL. v. METHODIST HEALTH SYSTEMS, INC.

### Direct Appeal from the Chancery Court for Dyer County
No. 03C202    W. Michael Maloan, Chancellor

---

### No. W2004-01195-COA-R3-CV - Filed March 14, 2005

---

This case presents the interpretation of a transfer restriction clause in an LLC operating agreement. The plaintiffs filed a motion for summary judgment requesting a declaration that the defendant, by negotiating for the sale of its interest in the LLC and granting a third-party buyer an option to purchase defendant's interest, had triggered the plaintiffs' preemptive purchase rights under the operating agreement. The defendants filed a cross-motion for summary judgment arguing that the transfer restriction clause in the operating agreement was triggered only by written notice of the intent to sell, which was never given. The trial court found that, under the language of the operating agreement, the plaintiffs' preemptive purchase rights were triggered by the"desire or wish" of the selling member to transfer its interest and that the defendant had the desire or wish to transfer its membership interest in the LLC. The defendant appeals. We affirm.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Robert A. McLean and Georgia A. Robinette, Memphis, Tennessee, for the appellants, Methodist Health Systems, Inc.

Douglas W. Wilkerson and W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellees, Riverside Surgery Center, LLC, Jeffrey Swetnam, M.D., G. S. Bindra, M.D., Richard Cape, M.D.,Jim Caylor, M.D., Roy Chu, M.D., Michael Heck, M.D., Carl Huff, M.D., Jerry Jernigan, M.D. Ian Laing, M.D., Russell Lomas, M.D., Fred Moore, M.D., Said Nabhan, M.D. and Ramzi Younis, M.D.

# OPINION

## *Factual Background and Procedural History*

In 1996, Methodist Health Systems, Inc. ("Methodist") and a group of physicians (the "Physicians") formed Riverside Surgery Center, LLC ("Riverside"), an ambulatory surgery center designed for out-patient surgery. In 1997, the parties executed an operating agreement for the governance of Riverside (the "Operating Agreement"). Pursuant to the Operating Agreement, the Physicians owned a 51% interest in Riverside, while Methodist owned the remaining 49% interest. Additionally, within the Operating Agreement the parties included a transfer restriction clause, or "right of first refusal" provision, designed to restrict the transferability of an individual member's interest in Riverside. The pertinent provisions of the Operating Agreement provide as follows:

> 16. RESTRICTION UPON TRANSFER OF ALL OR PART OF A MEMBER'S INTEREST. A Member may not sell, assign or otherwise transfer (hereafter, collectively "transfer") all or part of its interest in the Company (i.e., financial interests and governance rights) to any person except as specified below in this paragraph:
>
> > (a) The Member(s) wishing to transfer its interest must give written notice to all Members of the intent to transfer the interest, and must offer the Physician Members the first opportunity to purchase such interest. Any Physician Member(s) who wish [sic] to purchase the interest shall have the first right to purchase said interest at the price provided for in Section 18. . . .
> >
> > (b) If no Physician Member(s) desires to purchase such interest at such price, and if notice of the desire to purchase such interest is not received by the Member wishing to transfer its interest within thirty (30) days after the Physician Members' receipt of the notice of intent to sell, then Methodist shall have the right to purchase the interest at the price provided for in Section 18. If Methodist desires to purchase the interest, it shall give written notice within thirty (30) days after the expiration of the thirty (30) day period referred to above to the Member who wishes to transfer the interest.
> >
> > (c) If no Physician Member(s) nor Methodist agree to purchase the entire interest of the Member desiring to transfer at the price provided for in Section 18 within the time limits set forth in paragraph [16](b), then the Member desiring to transfer shall be free of the restrictions of this Section 16 for a period of ninety (90) days after the expiration of the cumulative sixty (60) day period in Section [16](b), and may

-2-

offer, and transfer the interest to any willing buyer, at the price provided for in Section 18.

. . . .

18. PURCHASE PRICE; LIABILITIES. In the event of a purchase and sale required by Section 16 . . ., the purchase price to be paid to the selling Member . . . shall be based upon the "net book value" of the Company which shall be defined as all Company assets except real property minus all Company liabilities plus the appraised value of any real estate owned by the Company determined as of the date that a selling Member gives notice to the Company of his desire to sell or terminate. . . . The price to be paid shall be a proportionate part of that net equity, such proportion to be equal to the proportion of the Company owned by the selling . . . Member.

In 2002, the parties began exploring the possibility of a change in the ownership structure of Riverside. In April 2002, the Physicians hired the Bloom Organization ("Bloom") to prepare a valuation report of Riverside and provide strategic recommendations for the simultaneous purchase of Methodist's interest in Riverside and re-syndication of that interest to a third-party ambulatory surgery center or management company. Dr. Jeffrey Swetnam, Chief Manager of Riverside, testified in his deposition that Bloom was consulted to determine the book value and fair market value of Riverside in order to establish the cost of buying out Methodist. Following Bloom's valuation reports, the Physicians received several offers for Riverside, including one from Baptist Health Services, but none were accepted.

Later in 2002, Methodist began soliciting bids from various healthcare companies for the purchase of Methodist's west Tennessee assets. In its bid requirement sheet, Methodist provided that, as part of the minimum requirements to bid, the bidding party "[m]ust agree to the acquisition of the assets (but not working capital) of all 7 hospitals, affiliated companies, physician practices, physician agreements and joint ventures." Although Riverside was included among the assets listed in the bid sheet, Methodist claimed that all west Tennessee assets were included so that prospective bidders could not "cherry pick" the properties they wished to purchase. On August 29, 2002, Community Health Systems, Inc. ("CHS") submitted a formal proposal to Methodist indicating its desire to purchase certain Methodist assets, including Methodist's interest in Riverside. Methodist's board of directors met on September 25, 2002 and, by resolution, authorized further negotiations with CHS through the execution of a letter of intent. The letter of intent stated, "[this letter agreement . . . memorializes the agreement between CHS and [Methodist] to work diligently and in good faith to negotiate, execute and deliver a definitive asset purchase agreement in substantially the form attached hereto as Exhibit A." The following day, Methodist issued a press release announcing that it had entered into exclusive negotiations with CHS to sell seven of Methodist's hospitals, along with associated operations.

On October 22, 2002, Dr. Swetnam wrote a letter to Methodist indicating that Methodist's actions may have triggered the Physicians' rights under Section 16 of the Operating Agreement and

that the Physicians were in the process of determining the book value of the surgery center. As a postscript to the October 22, 2002 letter, Dr. Swetnam stated: "As per our discussion, should Methodist desire to make an offer for our 51%, please submit in writing." Methodist promptly responded by letter advising the Physicians that it had not yet a made a final determination of whether it would sell its interest in Riverside and, therefore, had not sent notice of such intent to other members of Riverside.

On October 23, 2002, the day following Dr. Swetnam's letter to Methodist, Methodist's board of directors met and adopted another resolution regarding the proposed Methodist/CHS transaction. In that resolution, Methodist referenced the ongoing negotiations with CHS, including the letter of intent and draft asset purchase agreement listing Riverside as an asset. During the course of negotiations between Methodist and CHS, Dr. Swetnam met with representatives of both Methodist and CHS in an attempt to reach an agreement regarding the sale of either the Physicians' or Methodist's interest in Riverside, but the parties were unable to reach a satisfactory resolution.

At some point after October 23, 2002, Methodist withdrew its interest in Riverside from inclusion in the Methodist/CHS transaction, and, by letter dated November 27, 2002, Methodist informed Dr. Swetnam that it would retain its interest in Riverside. Therefore, the Methodist/CHS transaction closed on January 3, 2003 without the inclusion of Riverside. However, simultaneous with the closing of the Methodist/CHS transaction, Methodist executed an option agreement with CHS and Dyersburg Hospital Corporation ("DHC"), a wholly owned subsidiary of CHS, that, conditioned upon the Physicians waiving their right of first refusal, (1) granted DHC an option to purchase Methodist's interest in Riverside for a period of three years and (2) granted DHC, for a period of two years following the option period, a right of first refusal upon the sale of Methodist's interest in Riverside (the "DHC Option/First Refusal Agreement"). Specifically, the DHC Option/First Refusal Agreement provided, in pertinent part, the following:

1. Option. For a period of three (3) years following the execution of this Agreement (the "Option Period") and subject to the limitations set forth in Section 4 hereof, DHC may exercise the option (the "Option") to acquire [Methodist's 49% membership interest in Riverside] for the [amount of $1,800,000]. DHC may exercise the Option by sending written notice of the exercise of the Option (the "Option Notice") to Methodist during the Option Period. Upon receipt of the Option Notice, Methodist shall make reasonable and good faith efforts to obtain the consents and approvals described in Section 4 hereof. If such consents and approvals cannot be reasonably obtained by Methodist within thirty (30) days of the Option Notice, [Methodist's 49% interest in Riverside] will not be transferred, and DHC may exercise the Option at any time during the remainder of the Option Period.

2. Right of First Refusal. During the fourth (4th) and fifth (5th) years following the execution of this Agreement (the "Refusal Period") and subject to the limitations set forth in Section 4 hereof, if Methodist desires to transfer all or any part

-4-

of [its 49% interest in Riverside] to any person other than DHC, Methodist shall give to DHC written notice. . . .

. . . .

4. Consents and Approvals. Notwithstanding any other terms or provisions of this Agreement, Methodist shall not be required to transfer [its 49% interest in Riverside] or give notice of Methodist's intent to transfer [such interest] unless and until Methodist has received all consents and approvals (including waivers of the transfer restrictions) required by the Operating Agreement for the transfer of [Methodist's 49% interest in Riverside] to a third party.

On May 2, 2003, the Physicians filed a complaint against Methodist, containing four counts: (1) a request for a declaratory judgment setting forth the rights, status, and obligations of the parties under the Operating Agreement, in light of the actions of Methodist; (2) a claim for breach of contract and request for specific performance based upon Sections 16 and 18 of the Operating Agreement; (3) a claim for breach of the duty of good faith and fair dealing; and (4) a third-party beneficiary claim on behalf of Riverside. Following Methodist's answer and counterclaim, the Physicians filed a motion for partial summary judgment as to the first and second counts of their complaint asserting that, under Section 16 of the Operating Agreement, Methodist had triggered the Physicians' "right of first refusal" by its "wish or desire" to sell its interest in Riverside. Methodist filed a cross motion for summary judgment asserting that the Physicians had erroneously interpreted the triggering provisions of Section 16 of the Operating Agreement and, in addition, that the Physicians' claims should be barred by principles of equity due to their own actions during the course of the negotiations between Methodist and CHS. The trial court entered an order granting summary judgment to the Physicians, finding that, as a matter of law, the "trigger" under Section 16 of the Operating Agreement was the selling member's "desire or wish" to transfer its membership interest. Finding that it was undisputed that Methodist wished or desired to transfer its interest, the trial court concluded that Methodist was in violation of Section 16 of the Operating Agreement by reason of its failure to give notice and its failure to offer its membership interest to the Physicians. In denying Methodist's motion to alter or amend the judgment, the trial court referenced the fact that Methodist also possessed the "clear intent" to sell its membership interest in Riverside. However, the court found that possessing the "wish to sell" was a "preliminary step" and that Methodist had gone "far beyond that point in time."

From the trial court's order granting summary judgment to the Physicians, Methodist appeals and presents, as we perceive them, the following issues for our review:

(1) Whether the trial court erred in interpreting the Operating Agreement and thus erred in granting partial summary judgment to the Physicians on their claim that Methodist's conduct with regard to the sale of its membership interest in Riverside triggered the Physicians' right of first refusal;

-5-

(2)    Whether the trial court erred in finding that there was no genuine issue of material fact as to whether Methodist wished or desired or alternately, intended, to sell its interest in Riverside;

(3)    Whether the trial court erred in finding (a) that the doctrines of unclean hands, waiver and/or estoppel did not bar the Physicians' claim for relief, including specific performance and injunctive relief, or (b) that there was no genuine issue of material fact as to this issue; and

(4)    Whether the trial court erred by finding that Riverside Surgery Center, LLC had standing to sue in this case.

For the reasons stated herein, we affirm.

### *Standard of Review*

We review an order granting summary judgment *de novo* with no presumption of correctness afforded to the trial court. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534 (Tenn. 2002). Summary judgment is appropriate only when the moving party can demonstrate that there are no disputed issues of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04 (2004); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993). Where a case involves purely legal issues, such as the interpretation of a written agreement, summary judgment is an appropriate method of disposition. *Byrd*, 847 S.W.2d at 210; *Rainey v. Stansell*, 836 S.W.2d 117, 118–19 (Tenn. Ct. App. 1992). In determining whether to award summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Staples v. CBL & Assocs.*, 15 S.W.3d 83, 89 (Tenn. 2000). The court should award summary judgment only when a reasonable person could reach but one conclusion based on the facts and the inferences drawn from those facts. *Id*.

### *Interpretation of the Riverside Operating Agreement*

The Physicians contend that the trial court correctly interpreted the Operating Agreement to require only that Methodist's "wish or desire" to sell its interest in Riverside was sufficient to trigger the Physicians' rights under Section 16. Methodist, however, argues that a proper construction is that the triggering mechanism under Section 16 is the written notice of the specific intent to sell, rather than the subjective desire or wish to transfer a member's interest. Further, Methodist characterizes the trial court's ruling as essentially granting the Physicians a right of first negotiation, rather than a right of first refusal. We believe that neither party's interpretation of the provision in question is completely accurate.

As this case involves the construction of a written agreement, we begin our analysis with a review of basic rules of contract interpretation. When interpreting a contract, the guiding principle is to "ascertain the intention of the parties and to give effect to that intention consistent with legal

principles." *Rainey*, 836 S.W.2d at 118 (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn.1975)). In determining the intent of the contracting parties, the court should look to the four corners of the document, and, where there is no ambiguity, the terms of the contract should be given their ordinary meaning. *Winfree v. Educators Creditor*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995). The courts should also look to the subject matter of the agreement, the circumstances of the transaction giving rise to the particular issue before the court, and the prior conduct of the parties in carrying out the contract's terms. *Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990).

In general terms, a "right of first refusal" is the generic label commonly used to describe a contractual right to preempt another. 3 Corbin on Contracts § 11.3, at 469 (Joseph M. Perillo ed., 1996). The conventional right of first refusal "is subject to an agreed condition precedent, typically the owner's receipt of an offer from a third party and the owner's good-faith decision to accept it." *Id*. at 470. At that point, the right of first refusal "ripens" into an option, and the preemptive right holder may exercise his preemptive right to create a contract based on the same terms that the owner is willing to accept from the third party. *See id*. at 470–71. However, the triggering of the right of first refusal is dependent on the language of the contract and varies with the facts of the case. *See e.g.*, *Johnson v. Herren*, C.A. No. 88-160-II,1988 WL 119278, at *4 (Tenn. Ct. App. Nov. 10, 1988) *perm. app. denied* (Tenn. June 26, 1989)("All that is required to trigger the right of first refusal is for Herren to make a sales offer. No third party need accept it."); *Sager v. Rogers*, Sevier Law C.A. # 115, 1987 WL 6718, at *2 (Tenn. Ct. App. Feb. 20, 1987) *perm. app. denied* (Tenn. Aug. 3, 1987) (reasoning that right of first refusal was triggered at the instant the selling party was willing to accept the third party's offer); *Estate of Johnson v. Carr*, 706 S.W.2d 388, 391 (Ark. 1986) (holding that the preemptive right triggered by the owner's "desire to sell" had not been invoked by letter stating that owner was "seriously considering" selling); *Vietor v. Sill*, 243 So.2d 198 (Fla. Dist. Ct. App. 1971) (concluding that right of first refusal was invoked by an intention to sell, not a binding contract); *New Haven Trap Rock Co. v. Tata*, 177 A.2d 798, 800 (Conn. 1962) (interpreting agreement to provide that it was necessary only for the seller "to give thought to or entertain the idea of selling" to trigger the right of first refusal).

The preemptive purchase right under Section 16 is unlike a traditional garden-variety right of first refusal because the price terms and other conditions are not determined by reference to a third-party offer, as in the case of a typical right of first refusal. The "right of first refusal" in the present case is more closely akin to what at least one court has termed a "right of first offer," which entitles the holder the right to receive the first offer to purchase, with the sale price and other terms being provided for in advance in the agreement. *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 139 (3d Cir. 2001). Under the Operating Agreement, when the preemption rights of Section 16 are triggered, Section 18 of the Operating Agreement expressly provides the method for ascertaining the sale price. Therefore, our decision as to whether the actions taken by Methodist triggered the Physicians' "right of first offer" turns solely on the language of Section 16 of the Operating Agreement.

There is substantial evidence in the record reflecting that Methodist gave strong consideration to the inclusion of Riverside in the Methodist/CHS transaction, as demonstrated by the resolutions of Methodist's board of directors, the letter of intent, and the draft asset purchase agreement. However, we agree with Methodist that Section 16 is not subjectively triggered by the selling member's "wish or desire" to sell. At the same time, we do not believe, as Methodist argues, that the preemptive purchase rights under Section 16 are triggered simply by written notice of the final decision to sell. Rather, notice under Section 16 appears to merely be a procedural mechanism by which the Physicians are afforded the opportunity to exercise their preemptive purchase rights. Under Methodist's strict interpretation, Methodist could theoretically defeat the Physicians' preemptive purchase right by simply not providing notice.

Turning to the operative language of Section 16, it provides that "[a] Member may not sell, assign, *or otherwise transfer* (hereafter collectively transfer) all or part of its interest . . . except as specified below." Subsection (a) of Section 16 goes on to provide, "[t]he Member(s) wishing to transfer its interest must give written notice to all Members of the *intent to transfer* the interest, and must offer the Physician Members the first opportunity to purchase such interest." Looking at subsection (a) of Section 16, the substance of the notice is a statement by the selling member of his or her intent to transfer. By necessity, the substantive intent to transfer must be formed before the notice is given. Therefore, we believe that the preemptive rights under Section 16 are triggered once the selling member possesses the intent to otherwise transfer his or her interest. At that point, the selling member is obligated to first offer the interest to the Physicians at the price structure provided for under Section 18. The parties were free to word the Operating Agreement as they saw fit, and it is our duty, as it was the Chancellor's, to interpret the agreement.

In a different case, proving the selling member's intent could present a significant obstacle to the party enforcing a similar provision. Under the undisputed facts of this case, however, we believe it is not so difficult. Without looking at the various board resolutions, the letter of intent, the draft asset purchase agreement and other paper work supportive of the Physicians' position, we find that Methodist's execution of the DHC Option/First Refusal Agreement was unequivocal evidence of its intent to otherwise transfer its interest in Riverside. Although Section 4 of the DHC Option/First Refusal Agreement states that the agreement is subject to the consent and approval of the Physicians, the agreement nonetheless clearly demonstrates Methodist's intent to transfer its interest in Riverside. Therefore, we conclude that, by executing the DHC Option/First Refusal Agreement, Methodist triggered the Physicians' preemptive rights under Section 16 of the Operating Agreement. Accordingly, we further conclude that the Physicians are entitled to summary judgment on this issue.

### Unclean Hands

As a preliminary matter, although in its brief Methodist couches its argument in terms of unclean hands, *waiver and estoppel*, we find nothing in Methodist's brief pointing to any law or facts that meaningfully support any waiver or estoppel argument. Rather, it appears that Methodist's only discernible argument on this point pertains to the doctrine of unclean hands. Methodist argues that

the Physicians should be barred from equitable relief based on the Physicians' own conduct during the course of this dispute. Methodist points to the Physicians' commission of Bloom to prepare a valuation report on Riverside; the fact the Physicians did not raise the issue of the right of first refusal until almost a month after they learned of the negotiations between Methodist and CHS; and the fact that the Physicians met with Methodist and CHS representatives during this time and discussed the sale or resolution of the competing interests.

The doctrine of unclean hands has been explained as follows: "[A] complainant, who has been guilty of unconscientious conduct or bad faith, or has committed any wrong, in reference to a particular transaction, cannot have the aid of a Court of Equity in enforcing any alleged rights growing out of such transaction." *Hogue v. Kroger Co.*, 373 S.W.2d 714, 716 (Tenn. 1962) (quoting Gibson's Suits in Chancery § 51). "Once found to exist, the doctrine of unclean hands repels the unclean plaintiff at the steps of the Courthouse." *Farmers & Merchants Bank v. Templeton*, 646 S.W.2d 920, 924 (Tenn. Ct. App. 1983). Our review of the record indicates that the actions taken by the Physicians during the Methodist/CHS negotiations amounted to nothing more than the lawful exercise of their rights and authority under the Agreement. There is nothing to indicate any wrongdoing, bad faith, or other behavior that would warrant the application of the unclean hands rule. Accordingly, we find this issue to be without merit.

### *Riverside's Third Party Beneficiary Status*

The Physicians filed this complaint in their individual capacity and in the name of Riverside Surgery Center, LLC, thus making Riverside a party to this action. Methodist contends that Riverside has no standing to sue in this case because Riverside is only included as a third party beneficiary to the Operating Agreement, and the complaint fails to state a claim for relief on behalf of Riverside under this theory. Methodist also contends that Riverside is not a party to the Operating Agreement and that the Operating Agreement was intended only to benefit the members, not Riverside itself. The Physicians argue that this issue is not ripe for appeal, and this Court lacks jurisdiction because the trial court's decision on this issue was not made a part of the final order.

Alternatively, the Physicians contend that Riverside is a party to the Operating Agreement within the meaning of sections 29-14-103,[1] 48-206-101(c),[2] and 48-212-101(2)[3] of the Tennessee Code.

Under Rule 13(b) of the Tennessee Rules of Appellate Procedure, the appellate courts of this state may, in their discretion, consider certain issues in order "to prevent needless litigation." Tenn. R. App. P. 13(b) (2004). Although the trial court's decision on this issue was not made a final order, we will address it nonetheless. While the parties have focused heavily in their arguments on whether Riverside is an intended third-party beneficiary of the Operating Agreement, we believe the parties' concentration is misdirected. Under Tennessee's Limited Liability Company Act, the LLC itself is granted certain general powers "to do all things necessary or convenient to carry out its business and affairs." Tenn. Code Ann. § 48-212-101 (2002). The first power granted to the LLC under section 48-212-101 is the power to "[s]ue and be sued, complain and defend in its LLC name." *Id*. § 48-212-101(1). As the LLC and its member are bound by the LLC operating agreement under section 48-206-101(c), we believe any breach of the operating agreement would constitute the LLC's "business and affairs." *See id*. § 48-212-101. Thus, the LLC has the authority to sue in its name to enforce its

---

[1] Section 29-14-103 of the Tennessee Code, Tennessee's Declaratory Judgment Act, provides as follows:

> Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Tenn. Code Ann. § 29-14-103 (2000).

[2] Section 48-206-101(c) of the Tennessee Code addresses the binding effect of an operating agreement on an LLC. That section provides as follows:

> BINDING EFFECT. Unless otherwise provided in the articles or in an operating agreement adopted or agreed to by all members and holders of binding contribution agreements, an operating agreement that has been adopted or agreed to by the required vote of the members and person or entity bound by a contribution agreement shall be binding on the LLC and its members, and any person or entity becoming a member or entering into a contribution agreement or a contribution allowance agreement and such person shall be deemed to have adopted and agreed to it.

Tenn. Code Ann. § 48-206-101(c) (2002).

[3] Section 48-212-101 of the Tennessee Code provides that "[t]he LLC has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs." Tenn. Code Ann. § 48-212-101 (2002). Included among those general powers, the LLC has the power to "[m]ake and amend an operating agreement not inconsistent with its articles or with the laws of this state, for managing the business and regulating the affairs of the LLC." *Id*. § 48-212-101(2).

operating agreement.  Accordingly, we conclude that the trial court did not err in denying Methodist's motion to dismiss Riverside for lack of standing.

### *Conclusion*

For the foregoing reasons, we affirm the judgment of the trial court.  Costs of this appeal are taxed to the appellant Methodist Health Systems, Inc. and its surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE