**UNITED STATES of America,**
**Plaintiff,**

v.

**State of TENNESSEE,**
**et al., Defendants,**

**and**

**People First of Tennessee and Parent–Guardian Association of Arlington Developmental Center, Intervenors.**

No. 92–2062.

United States District Court,
W.D. Tennessee,
Western Division.

July 8, 2009.

Amie S. Murphy, Amin Aminfar, R. Jonas Geissler, Robert A. Koch, Corey M. Sanders, Matthew Donnelly, United States Department of Justice, Washington, DC, Joe A. Dycus, U.S. Attorney's Office, Memphis, TN, for Plaintiff.

Dianne Stamey Dycus, Attorney General and Reporter, Nashville, TN, David Lehn, Derek L. Shaffer, Jesse Panuccio, Cooper & Kirk PLLC, Washington, DC, for Defendants.

Earle J. Schwarz, The Offices of Earle J. Schwarz, Kimbrough Brown Mullins, Mullins Gardner, PLC, Memphis, TN, Edward G. Connette, Essex Richards, P.A., Charlotte, NC, Frank J. Laski, Judith A. Gran, Philadelphia, PA, Jack W. Derryberry, Jr., Ward Derryberry & Thompson, Marcella G. Derryberry, Law Offices of Marcella G. Derryberry, Nashville, TN, William F. Sherman, Law Offices of William F. Sherman, Little Rock, AR, for Intervenors.

**ORDER GRANTING INTERVENOR PEOPLE FIRST'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS STATE OF TENNESSEE *ET AL.*'S MOTION FOR SUMMARY JUDGMENT**

BERNICE BOUIE DONALD, District Judge.

Before the Court are Intervenor People First of Tennessee's ("People First") motion for partial summary judgment (D.E. # 2400) and Defendants State of Tennessee *et al.*'s ("Defendants" or "State") motion for summary judgment (D.E. # 2404). On Thursday, July 2, 2009, the Court entered a summary order **GRANTING** People First's motion and **DENYING** Defendants' motion. This order hereby sets forth the reasons for the Court's ruling.

## I.  BACKGROUND [1]

This case began in 1992 when the United States of America filed suit against Defendants because of conditions at Arlington Developmental Center ("ADC"), a state-run intermediate care facility for mentally retarded persons ("ICF/MR"). *See United States v. Tennessee,* 925 F.Supp. 1292, 1296 (W.D.Tenn.1995). Since the Court's 1993 holding that conditions at ADC violated the constitutional rights of its residents, litigation in this case has focused on finding and implementing an appropriate remedy. Eventually, the parties reached a settlement which provided that ADC should be closed and replaced with alternative means of delivering necessary care and services to mentally retarded individuals in West Tennessee. Further, the Court's orders directed Defendants to improve conditions at ADC pending its scheduled closure.

In 1995, the Court certified a plaintiff class in the related action of *People First of Tennessee v. Arlington Development Center,* Case No. 92–2213 (W.D.Tenn.), allowed People First to join the instant suit, and extended the relief in this case to the plaintiff class in *People First.* In the process, the Court expanded the scope of this litigation to concern more than merely the specific living conditions at ADC. The parties subsequently began to develop a plan to provide services to members of the Arlington class.[2] Discussions continued from 1999 into 2000, and the parties eventually drafted a plan for the creation of the Community Services Network of West Tennessee, Inc., a nonprofit organization with which the State would contract to provide a host of services. (D.E. # 2400–3 (Ex. J): Prewitt Decl. at 3.) Disagreement among the parties persisted, however, as a result of a dispute over which individuals would be eligible for CSN services. (*Id.*) Judge McCalla, before whom this case was then pending, held a status conference on March 9, 2000 to discuss the parties' inability to reach an agreement. (*Id.*) During this conference, counsel for Defendants (Assistant Attorney General Dianne Dycus) unambiguously stated to Judge McCalla that the residents of ICF/MRs— who then numbered 30—would have the option of enrolling in CSN, though the State did not concede that certain other class members would likewise be eligible. (*See* D.E. # 2400–3 (Ex. W): Tr. of March 9, 2000 Hr'g.)

Upon learning of the State's opposition to covering all persons within the Arlington class, Judge McCalla found that the

---

1.  This case possesses an extensive procedural history. The Court includes in this order only those procedural facts that are directly relevant to the instant motion.

2.  The precise definition of the Arlington class has been subject to much dispute. *See United States v. Tennessee,* 143 Fed.Appx. 656, 659–61 (6th Cir.2005).

State had never before expressed this position and set a deadline for it to inform the Court whether it would accept an agreement to provide services to the entire class. (*See* Prewitt Decl. at 3–4.) The State eventually consented to cover the entire class as defined by the Court. (*See* D.E. #1226: Order of March 20, 2000.) The Court ordered the State to execute a grant contract with CSN by April 15, 2000. (*See* D.E. #1248: Order of April 5, 2000.) On April 12, 2000, the State complied, executing the grant contract with CSN that it has thereafter consistently renewed. (*See* Prewitt Decl. at 4.) .

Following execution of the CSN contract in 2000, at least some class members who were residents of ICF/MRs enrolled in CSN. (*See* Prewitt Decl. at 6; *see also* D.E. #2400–3 (Ex. N): Hanson Decl. at 2.) In fact, the evidence shows that somewhere from 20% to 25% of the original group of class members who enrolled in CSN resided in ICF/MRs. (*See* Prewitt Decl. at 6; Hanson Decl. at 2.) The parties dispute whether these individuals have received CSN services continuously since 2000 or if they were instead later removed from CSN enrollment. It is clear, however, that officials acting on behalf of the State have used the term "community" to describe ICF/MRs and have, at least at times, considered ICF/MR residents eligible to participate in CSN. For instance, the State's Closure Plan for ADC states that all class members, including those who "live in a community-based ICF/MR home," will have access to CSN services. (*See* D.E. #2400–3 (Ex. P): Closure Plan.) In 2006, the State began efforts to enroll in CSN all class members residing in ICF/MRs as part of a process to tailor CSN services to these individuals' particular needs. (*See* Hanson Decl. at 3–7.) Additionally, in early 2008 the State issued letters to class members, including those residing at ICF/MRs, informing them of their eligibility to enroll in CSN. (*See* D.E. #2400–3 (Ex. Q): Norris Letter.)

In December 2008, the State notified CSN that it was not authorized to provide services to individuals residing in institutions (*viz.*, ICF/MRs), only those residing in home and community-based waiver services. (*See* Prewitt Decl. at Ex. A: Letter of D. Dycus of Dec. 17, 2008.) This ignited the controversy that is the subject of the cross-motions before the Court. People First filed a motion seeking a declaration from the Court that CSN services are available to all Arlington class members, regardless of where they reside, so long as they do not reside at ADC. (D.E. #2332: People First's Emergency Motion for Declaratory Relief.) Defendants oppose this request for declaratory relief. People First later filed a motion for partial summary judgment on the question of eligibility for CSN services,[3] and Defendants filed a motion for summary judgment raising the same issue.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999), evidentia-

---

**3.** People First's motion for declaratory relief further asks for a declaration that the State must provide CSN with "full funding," but People First does not seek summary judgment on this aspect of its motion for declaratory relief, which is why People First's motion requests only *partial* summary judgment.

ry materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thaddeus–X v. Blatter,* 175 F.3d 378, 400 (6th Cir.1999). The evidence and justifiable inferences based on facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 460 (6th Cir.2001).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. This may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727 (3d ed. 1998).

Once a properly supported motion for summary judgment has been made, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348.

## III. ANALYSIS

The cross-motions filed by People First and Defendants raise the same issue—whether CSN services are available under the grant contract to individuals residing in ICF/MRs. The parties agree that the relevant language of the grant contract reads as follows:

> The services that will be provided by the Community Services Network of West Tennessee (CSN) must provide comprehensive and appropriate interdisciplinary care to individuals with developmental disabilities in *community placements.* The benefit package has been designed to support the goal of providing the improved quality of care and quality of life available to individuals with developmental disabilities in well designed *community settings.*

(D.E. # 2400–3 (Ex. M): Grant Contract (emphasis added)). The grant contract does not define what is meant by the term "community." According to People First, ICF/MR residents are eligible for CSN services because use of the term "community" refers simply to a placement other than at ADC. Defendants contend, however, that "community" refers to placement other than at an "institution" and that ICF/MRs are properly considered "institutional" rather than "community" placements. The parties agree that this question is controlled by the language of the grant contract, which is to be interpreted according to Tennessee law,[4] and that this

4. Properly speaking, there exists a difference    between "interpretation" and "construction"

issue is capable of resolution on summary judgment.

## A. Contract Interpretation under Tennessee Law

"The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975); *see Rainey v. Stansell*, 836 S.W.2d 117, 118–19 (Tenn.Ct.App.1992). The intention of the parties is to be gleaned from the four corners of the contract, and the contract's terms are to be given their "ordinary meaning" in the absence of any ambiguity. *Riverside Surgery Ctr., LLC v. Methodist Health Sys., Inc.*, 182 S.W.3d 805, 811 (Tenn.Ct.App.2005) (citing *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn.Ct.App.1995)); *see Rainey*, 836 S.W.2d at 119 ("In construing contracts, the words expressing the parties' intentions should be given their usual, natural[,] and ordinary meaning[.]"); *see also Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn.Ct.App.1980) ("[O]rdinary meaning is that meaning which would have been derived from its words by reasonable persons dealing in the same situation as that of the contracting parties."). "The court, at arriving at the intention of the parties to a contract, does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." *Rainey*, 836 S.W.2d at 119. In the absence of fraud or mistake, a court must enforce an unambiguous contract as written, even if the agreement proves to have been unwise or burdensome. *Boyd v. Comdata Net-*

*work, Inc.*, 88 S.W.3d 203, 223 (Tenn.Ct. App.2002).

When a contract contains ambiguous language, the literal terms of the agreement alone cannot resolve the dispute, and the court is compelled to discover the parties' intent through examination of other sources. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn.2002). In addressing a contractual ambiguity, "a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn.2006); *see Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn.1985). Moreover, extrinsic evidence that provides insight into the proper interpretation or meaning of the terms in a fully integrated written contract is freely admissible—provided this evidence does not vary, contradict, or add to the terms expressed in the instrument itself. *See* 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.10, at 63–107 (1998) [hereinafter *"Corbin"*] (stating, *inter alia*, that "[the parol evidence rule] does not exclude evidence offered for the purpose of interpreting and giving meaning to the terms of the contract."); *see also Restatement (Second) of Contracts* § 214(c) (1981) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish ... (c) the meaning of the writing, whether or not integrated[.]"). While courts do not favor either party in interpreting a contract, if it contains a vague or ambiguous term, the court may apply the rule of *contra proferentem* and resolve the uncertainty against

---

of a contract, but this is a fine distinction that Tennessee courts, much like many other courts and authorities, do not observe. *See* 21 Steven W. Feldman, *Tenn. Prac.: Contract*

*Law and Practice* § 8:2 (2008). The Court likewise will not attempt to make such a distinction in addressing the motions currently before it.

the party that drafted the agreement.[5] *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn.Ct.App.2003). If the contractual ambiguity remains after application of the interpretative aids available to the court, then the meaning of the contract becomes a question of fact. *Planters Gin*, 78 S.W.3d at 890; *Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn.Ct.App. 2003).

A disagreement between the parties as to the meaning of a contractual term does not itself make the disputed term ambiguous. *Staubach Retail Servs.-Southeast, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn.2005). Rather, the language of a contract is said to be ambiguous "only when it is of uncertain meaning and may fairly be understood in more ways than one." *Watson*, 195 S.W.3d at 611 (quoting *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975)); *see Planters Gin*, 78 S.W.3d at 890; *see also Dunn v. Duncan*, No. M2004–02216–COA–R3–CV, 2006 WL 1233046, at *3 n. 4 (Tenn.Ct.App. May 8, 2006) ("A contractual provision is ambiguous when the parties' intentions cannot be reliably ascertained by considering the language of the provision in light of the surrounding circumstances."). Moreover, ambiguity does not arise simply because a contract does not define a term or because the contract is silent on a particular issue. *See* 11 Richard A. Lord, *Williston on Contracts* § 30:4 (4th ed. Supp.2009). Whether a contract contains an ambiguity is a question of law. *Pierce v. Pierce*, No. E2007–01403–COA–R3–CV, 2008 WL 2557363, at *4 (Tenn.Ct.App. June 26, 2008). While summary judgment is inappropriate when the terms of a contract are ambiguous and the evidence reveals a gen-uine controversy as to the true meaning of the contract, *see, e.g., Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir.1990), if the undisputed evidence before the court removes the original ambiguity and the intended meaning of the disputed term becomes clear, then the court should proceed to render summary judgment, *see Planters Gin*, 78 S.W.3d at 890.

### B. "Community" as Used in the Grant Contract

The term "community" is nowhere defined in the grant contract, and after reviewing the grant contract, the Court finds no other language within the four corners of the document itself which would give "community" an obvious meaning. The grant contract does not, for instance, explain or describe CSN services in a way that necessarily excludes ICF/MR residents. Because the parties have offered reasonable but conflicting interpretations of "community" and the grant contract itself does not indicate which of these alternatives was intended, there is an initial ambiguity in the contract. Nonetheless, the evidence before the Court removes any possible doubt as to the meaning understood by parties at the time of contracting. Specifically, the Court finds that these parties understood and intended "community" to mean any placement other than at ADC, and thus ICF/MR residents are included within the meaning of that term.

Defendants urge the Court to look to the language of the Medicaid Act. Defendants refer to 42 U.S.C. § 1396d(d), which defines an ICF/MR as an "institution" and 42 U.S.C. § 1396n(c)(1), which draws a distinction between "home or community-based services" on the one hand and ser-

---

**5.** This rule, however, is to be applied only when all other tools have been unavailing. *Piper Indus., Inc. v. First Tennessee Bank,* *N.A.,* 1986 WL 4283, at *3 (Tenn.Ct.App. Apr. 11, 1986) (citing *Crouch v. Shepard,* 44 Tenn. 383 (1867)).

vices "in a hospital or a nursing facility or intermediate care facility for the mentally retarded" on the other. Thus, argue Defendants, relevant federal law provides the proper guidance for the meaning of the term "community" in the contract. Bodies of law may certainly provide the appropriate source of meaning for the terms in an agreement. *See, e.g., Frigaliment Importing Co., Ltd. v. B.N.S. Int'l Sales Corp.,* 190 F.Supp. 116, 119–21 (S.D.N.Y.1960) (Friendly, J.) (discussing use of federal regulations as a "dictionary" for purposes of interpreting private commercial contract). Defendants, however, do not offer evidence to indicate that at the time of contracting they intended or understood "community" to be interpreted in accordance with federal Medicaid law.

Defendants do argue, however, that in the process leading to the creation of CSN, the parties discussed several options involving the use of Medicaid funds, though none of these options would have provided federal moneys for ICF/MR residents.[6] People First responds by citing evidence that the State previously agreed to support its obligations to CSN irrespective of whether it could obtain federal financing for the initiative. (*See* D.E. # 1199: Notice of Filing of Information Regarding Eligibility Criteria for Waiver by Defendants of Feb. 24, 2000 ("The State is committed to funding this program [i.e., CSN] through the use of state funds, and, when available, federal matching funds.")). Indeed, the State's expressions of willingness to fund CSN without federal moneys reveals that federal criteria were not meant to control the scope of CSN eligibility.

Defendants also cite the fact that ADC residents are indisputably ineligible to receive services through CSN. According to Defendants, since ADC is an ICF/MR and nothing in the grant contract specifically excludes ADC from the meaning of "community" as used by the parties, the only principled way to read "community" is in contrast to "institution"—a term which includes all ICF/MRs, including ADC. While there is no particular language in the grant contract to exclude ADC residents (but not other ICF/MR residents), substantial evidence before the Court indicates that this is exactly the meaning the parties consistently have ascribed to the term "community" throughout the process of developing and implementing CSN. (*See, e.g.,* Prewitt Decl. at 2.) Accordingly, the Court finds that the lack of a precise prohibition on participation by ADC residents is far from fatal to People First's reading.

Finally, Defendants contend that providing CSN services to ICF/MR residents is redundant and creates unnecessary confusion because the individuals' facilities themselves are already responsible for the care of their residents. People First in turn cites evidence that CSN has successfully aided many individuals residing in ICF/MRs with needed medical care that their resident facilities did not provide. (*See, e.g.,* Hanson Decl. at 7–19.) Additionally, there is evidence that the CSN services for these individuals have been tailored to accommodate the fact that they reside in an ICF/MR. (*Id.* at 3–5.) Therefore, CSN services are not redundant, but are in fact responsive to the genuine needs of class members and intended to supplement the care that ICF/MRs themselves provide. Whatever the merits of providing CSN coverage to ICF/MR residents, however, they are largely irrelevant in determining what the

---

**6.** This process involved discussion as to how the State could fund its obligations through Medicaid waivers.

parties actually intended and incorporated into their contract. *See Tennessee Div. of the United Daughters of the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98, 118 (Tenn.Ct.App.2005) ("The courts do not concern themselves with the wisdom or folly of a contract, and are not at liberty to relieve parties from contractual obligations simply because these obligations later prove to be burdensome or unwise.") (internal citations omitted).

People First asks the Court to examine the context in which the grant contract was developed and the manner in which the State has since implemented it. To that end, People First relies upon the rule of practical construction to sustain its position. The rule of practical construction looks to "the interpretation placed upon a contract by the parties thereto, as shown by their acts" and their declarations. *See, e.g., Galleria Assocs., L.P. v. Mogk*, 34 S.W.3d 874, 877 (Tenn.Ct.App.2000) (citing *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn.1983)). Although some Tennessee cases contain language suggesting that the meaning indicated by the rule of practical construction is binding upon the court, this is hardly a settled principle of law. *See generally* 21 Steven W. Feldman, *Tenn. Prac.: Contract Law and Practice* § 8:60 (2008). Moreover, the greater weight of modern authority holds that, while entitled to serious consideration, application of the rule of practical construction is not necessarily conclusive, as the indications produced by other tools of contract interpretation should also be utilized in finding a contract's meaning.[7] *See* 5 *Corbin, supra,* § 24.16, at 152–53; *see also Restatement (Second) of Contracts* § 202.

In support of its argument, People First points to a letter Deputy Commissioner Stephen Norris of the Tennessee Division of Mental Retardation Services mailed to Arlington class members, including ICF/MR residents, stating that they were eligible for CSN services. (*See* Norris Letter.) People First further contends that ICF/MR residents have previously enrolled in CSN services and that the State, being fully aware that they were residents of ICF/MRs, acquiesced in these individuals' enrollments. (*See, e.g.,* Prewitt Decl. at 6.) Defendants claim that these enrollments were merely mistakes resulting from a misunderstanding of the grant contract, and that the State promptly removed ICF/MR residents from eligibility for CSN benefits shortly thereafter. (*See* Ex. H to Defs.' Mot. For Summ. J.: Denegri E-mail.) According to Defendants, from 2003 until 2007, ICF/MR residents were excluded from participation in CSN. (*Id.*) People First challenges the admissibility of the evidence Defendants cite for this contention, as this position relies upon a single e-mail containing inadmissible hearsay. Defendants have conceded[8] that the e-mail cannot be considered for the truth of the matter asserted, but urge the Court to consider it for its effect upon the listener. In the contested e-mail, CSN's chief operating officer writes that in 2002 some ICF/MR residents enrolled in CSN, but that they were discharged once a State official deemed them ineligible for CSN participation. Presumably, Defendants offer the e-mail to show that its recipients

---

7. Defendants and People First disagree as to whether under Tennessee law application of the rule of practical construction requires the court to first find a contractual ambiguity. Authorities recognize that Tennessee case law is unsettled on this point. *See* 21 Feldman, *supra* note 4, § 8:59. There is no need for this Court to decide this legal debate in the context of this case.

8. Counsel for Defendants made this concession orally at the Court's conference of June 29, 2009.

(two State officials and CSN's executive director) never disagreed with this statement. The Court finds that Defendants have not established that this e-mail possesses any probative value. Furthermore, even if the e-mail's assertions were assumed to be true, the e-mail indicates at most that the State has operated inconsistently over time in determining ICF/MR residents' eligibility for CSN. While the post-contracting conduct of these parties may be less than clear, the other indications of the parties' intentions are not.

Having considered the record and the evidence before it, the Court is left with no doubt that the parties have long used the term "community" to encompass a variety of placements outside of ADC, including residency in an ICF/MR. Before Judge McCalla, Defendants unmistakably described CSN's intended scope under the grant contract as reaching residents of ICF/MRs. It is unsurprising then that even years after execution of the grant contract Defendants described ICF/MRs as a form of "community" placement. (*See* Closure Plan at 22.) Notably, while People First has submitted verified proof—specifically the sworn declaration of CSN's attorney, who was involved in the creation of CSN—to support its argument that the parties always understood that ICF/MR residents were in "community placements" and thus eligible for CSN services, Defendants have not presented a competing declaration or affidavit from any of their participants to contradict this assertion. (*See, e.g.,* Prewitt Decl. at 2 ("The Grant Contract ... was always meant to cover all Class Members regardless of where they chose to live so long as they were residing anywhere other than Arlington Developmental Center.")).

Therefore, no admissible evidence before the Court indicates that the parties intended to exclude ICF/MR residents from CSN coverage. Rather, the evidence indicates that ICF/MR residents are categorically included in the term "community" and thus are eligible for CSN coverage. Although the term "community" in the grant contract is initially ambiguous, application of the standard tools of interpretation available under Tennessee law removes that ambiguity, and the record supports no interpretation other than that urged by People First. Accordingly, there remain no triable issues as to interpretation of the grant contract, and partial summary judgment for People First is appropriate.

## IV. CONCLUSION

For the reasons stated above, People First's motion for partial summary judgment is **GRANTED,** and Defendants' motion for summary judgment is **DENIED.**