IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 23, 2011 Session

NORTHWEST TENNESSEE MOTORSPORTS PARK, LLC
v.
TENNESSEE ASPHALT COMPANY

Direct Appeal from the Chancery Court for Weakley County
No. 20074    W. Michael Maloan, Chancellor

No. W2011-00450-COA-R3-CV - September 23, 2011

This is a breach of contract case. Appellants contracted with Appellees to pave their existing
drag strip. Because the soil under the drag strip contained too much moisture, the paving
project failed and other parts of the drag strip not included in the contract were damaged. The
trial court awarded damages for the Appellant, but later reduced the damages by the amount
over and above the original contract. Appellant appeals. Because the Appellant failed to
present any evidence that Appellee breached the contract, we reverse and remand.

Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed
and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,
W.S., and HOLLY M. KIRBY, J., joined.

Lewis L. Cobb and Teresa Anne Luna, Jackson, Tennessee, for the appellant, Northwest
Tennessee Motorsports Park, LLC.

Gregory L. Cashion, Nashville, Tennessee, for the appellee, Tennessee Asphalt Company.

OPINION

I. Background

In the spring of 2007, Plaintiff/Appellant Northwest Tennessee Motorsports Park,
LLC ("Northwest") began negotiations with Defendant/Appellee Tennessee Asphalt
Company ("TAC") to re-pave approximately 700 feet of Northwest's drag strip in Gleason,
Tennessee.

In TAC's bid on the project, it offered to mill two inches of existing asphalt from 700 feet of the drag strip, and to re-pave the area for $39,500.00. The bid specifically stated that:

> This price is with assuming [sic] that there is a proper subgrade and proper gravel or base specification when milling . . . . I'm sure you are getting tired of waiting on me so I wanted to get you these numbers under the assumption that we can mill and pave without sub-grade and base issues. I would still like to cut cores to investigate a little bit . . . .

The bid further stated that: (1) "[s]ubgrade [is] to be proof rolled with a loaded truck before installing hot-mix asphalt;" (2) the "[b]id is quoted assuming that the proper gravel or base material (minimum of 6") is in place after milling 2" of asphalt surface;" and (3) that the "[p]rice does not include gravel or base material, undercutting, or any other subgrade work."

Northwest accepted the bid and entered into a contract with TAC. The contract re-iterated the specific terms that were outlined in the bid, *supra*, and also included TAC's standard terms and conditions, which provide, in relevant part, as follows:

> <u>DAMAGES AND GUARANTEES.</u> Tennessee Asphalt Company guarantees that all supplied material will be as specified and all work shall be completed in a workmanlike manner according to standard industry practices. . . . All other liability, including liability for consequential damages is hereby excluded.
>
> * * *
>
> <u>WORK OF OTHERS.</u> Neither grading or compaction of subsurface ground are the responsibility of Tennessee Asphalt Company under this agreement. Tennessee Asphalt Company does not warrant it's [sic] work where defective work product or drainage problems result from improper preparation or installation of the underlying soil, gravel or base stone, when gravel or base stone is not a part of Tennessee Asphalt Company's work.

Prior to beginning work, TAC sent an employee to the drag strip to take core samples in four locations on the site. The coring machine used a drill bit and a water cooling system that could drop as much as two gallons of water onto the ground and into the holes left by coring. The core samples took an approximately two-inch section of asphalt from the surface of the drag strip to determine the depth of the existing asphalt. In two of the four samples, TAC noted water in the holes, but TAC's engineers testified that the water was due to the drill and was not an indication of moisture in the sub-grade. According to TAC's engineers, water in the holes left from coring was usual and no one was concerned about it.

TAC began milling off the existing two inches of asphalt on April 30, 2007. During the milling process, TAC became aware of "soft spots" in the asphalt that caused ruts in the sub-grade when the milling machine went over them. Additionally, when the pavement was proof rolled, as required under the contract, there was ground movement indicating a soft sub-grade.

At this point, TAC's engineer proposed two options: (1) purchase additional asphalt to fill in the ruts, which would be relatively quick and inexpensive, also known as an overrun; or (2) excavate and replace the existing sub-grade and re-pave the track, which would take considerably more time and money. While there is no evidence that TAC specifically guaranteed the work, Monte Smith, one of the owners of Northwest, testified that TAC informed him that they had successfully performed the faster, less expensive option on numerous occasions, and he relied on that information in choosing the first option. The parties entered a change order for the additional asphalt on April 30, 2007. The change order specifically provided for the additional asphalt at $60.00 per ton above the original amount in order to obtain "the best paving project possible when paving over the soft sub-grade." During testimony, Austin Bateman, an engineer for TAC, stated that the overrun agreement was "a standard practice in these situations."

TAC began paving on May 1, 2007. On the first pass over the drag strip, the paving machine became stuck. TAC continued paving, however, and the paver became stuck again, this time requiring heavy machinery to pull it out. TAC's use of the heavy equipment damaged other parts of the drag strip, including the staging and runoff area,[1] that were not covered under the contract. At this point, TAC suspended work on the project, except to place the remaining asphalt, which was ordered under the contract, onto the track and to smooth the surface with a tractor.

At this time, TAC and Northwest agreed to each pay one-half of the cost to test the sub-grade of the drag strip. The parties contracted with Construction Materials Laboratory, who sent engineer David Evans to do the testing and make a report. The report showed that the sub-grade had a high moisture content, which had caused the paving project to fail and the trucks to become stuck. According to Mr. Evans, the problem with the sub-grade pre-existed the contract to pave and was caused by improper drainage at the drag strip. He went on to testify, however, that, in the context of a two- or three-foot core sample, finding water was "not good" and that he, from an engineering and testing standpoint, would have recommended that the paving project cease at that time.

_____

[1] The staging area is the area before the start of the actual race track, where the cars line up to be paired off for racing. The runoff area is a long strip after the finish line of the race track where the cars decelerate safely and regain control in order to return to the staging area.

After the testing, TAC offered to complete the job by excavating the area, laying down new sub-grade or a special type of fabric to stabilize the area, and paving the drag strip. TAC estimated that the project would cost Northwest approximately $200,000.00. Instead of contracting again with TAC, Northwest contracted with Ford Construction to repair and replace the damaged drag strip with soil cement and two and three-fourths inches of asphalt, and to pave the staging and runoff areas that were damaged by TAC's equipment. Ford Construction charged $186,803.00 for the repairs.

While the repairs were being made, Northwest lost 13 weeks of business, during the peak racing season. Northwest also lost existing racers due to the unique point system utilized in drag racing.[2]

On July 16, 2007, Northwest filed suit against TAC in the Chancery Court of Weakley County, Tennessee, claiming breach of contract, negligent damage to real property, and violation of the Tennessee Consumer Protection Act. TAC counter-claimed, alleging breach of contract, violation of the Tennessee Consumer Protection Act, and violation of the Prompt Pay Act.

The case was tried on April 6, 2010. Northwest called several witnesses, including the owner of the drag strip, who generally attributed the defects in the drag strip to TAC. Northwest also called James E. Harrison from Ford Construction Company. While Mr. Harrison stated that movement during proof rolling would indicate some sort of problem, he never testified that the overrun agreement was not a standard industry practice or that water in two- to three-inch core samples indicated sub-grade moisture.

Various employees testified in favor of TAC. First John Taylor, an estimator salesman with no engineering training, testified that he could detect poor subsurface conditions only when the surface was visibly cracked, or "alligatored," and that, if he observed any cracking when looking over a property, he would not bid on the job. However, Mr. Taylor went on to state that, when he visited the Northwest property, he did not notice any "alligatoring" or any other conditions that led him to believe there were poor subsurface conditions. Consequently, he bid on the project. Additionally, he testified that TAC never does extensive testing on a property's sub-grade and that there was no basis to diverge from TAC's usual practice in this

---

[2] In drag racing, racers accumulate points throughout the year and receive cash prizes at the end of the season depending on the number of points accumulated. Therefore, it is in the best interest of a racer to remain with the same drag strip throughout an entire season, as accumulated points do not transfer from one drag strip to another. During the time that Northwest's drag strip was being repaired, the drag racers went to other drag strips and many declined to return to Northwest because they had already begun accumulating points at the other drag strips.

case. Mr. Taylor also testified that the water in the holes left by the corings did not concern him after speaking with TAC's engineers. On cross-examination, he did admit that, during his deposition testimony, he had stated that water in the core sample holes was an indicator of water in the sub-grade. However, on re-direct, Mr. Taylor stated that, at the time of his deposition, he did not know that the drill used to cut cores used a water cooling system, so he believed that the only source of water was the sub-grade.

TAC called several other employees who testified that the water found in the holes left by the corings was not indicative of moisture in the sub-grade. Austin Bateman testified that nothing put TAC on notice of the moisture in the sub-grade. This was because there was no water on the base stone after proof rolling. Moreover, Mr. Bateman stated that there was never any surface water on the drag strip or flowing into the test pit that TAC dug prior to paving.

On April 30, 2010, the trial court entered its judgment, including findings of fact and conclusions of law. In its judgment, the trial court relied on cases outside our jurisdiction, which imply a duty to warn in paving contracts. Thus, the trial court found that there was no negligence in the case, but that TAC had breached the warranty of workmanlike conduct expressed in the contract by failing to warn Northwest of the potential for moisture in the sub-grade after water was found in the core samples taken by TAC. The trial court further found that "the measure of damages for breach of a paving contract is the cost of repairing and resurfacing the entire area so as to rectify the inadequate pavement originally applied." Consequently, the court found TAC liable for the entire cost to excavate and re-pave the drag strip, including the staging and runoff areas not covered under the contract. The court also found that Northwest failed to establish its lost profit damages to a "reasonable certainty," and denied those damages. Finally, the court found that TAC's counterclaim was without merit and entered judgment in favor of Northwest in the amount of $186,803.00.

TAC filed a timely motion to alter or amend the judgment. After hearing the motion, on November 8, 2010, the trial court entered a revised judgment on December 21, 2010. In the revised judgment, the court again found that TAC had a duty to warn Northwest, but agreed with TAC that awarding Northwest the total cost of repair, i.e., $186,803.00, would put Northwest in a better position than it would have been in had the contract been fully performed. Therefore, the court credited TAC with: (1) $39,500.00 for the cost under the original contract; (2) $25,227.00 for the additional three-fourths inch of asphalt that Ford applied; and (3) $86,000.00 for the cost of the soil cement for the entire track. The court entered a revised judgment in favor of Northwest for $36,076.00. Northwest appealed.

## II. Issues Presented

Appellant Northwest raises two issues on appeal, which we restate as follows:

1. Whether the trial court erred in failing to award lost profits damages?
2. Whether the trial court erred in allowing credits for the additional three-fourths inch of asphalt and the cost of repairing the subsoil?

In the posture of Appellee, TAC raises the following, additional issues:

1. Whether the trial court erred in finding that TAC had a duty to warn Northwest of the inadequate sub-grade?
2. Whether the trial court erred in finding that TAC was responsible for the inadequate sub-grade?
3. Whether the trial court erred in awarding damages for re-paving an additional 700 feet of track that was not covered under the original contract?
4. Whether the trial court erred in failing to award TAC the contract price, as TAC did not breach the contract?

### III. Standard of Review

Because this case was tried by the court, sitting without a jury, this Court conducts a *de novo* review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. ***Wood v. Starko***, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Walker v. Sidney Gilreath & Assocs.,*** 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); ***The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). This Court reviews the trial court's resolution of legal issues without a presumption of correctness. ***Johnson v. Johnson***, 37 S.W.3d 892, 894 (Tenn. 2001).

The question of interpretation of a contract is a question of law**. *Guiliano v. Cleo, Inc.***, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness on appeal. ***Allstate Insurance Company v. Watson***, 195 S.W.3d 609, 611 (Tenn. 2006); ***Angus v. Western Heritage Ins. Co.***, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). "This Court must review the document ourselves and make our own determination regarding its meaning and legal import." ***Hillsboro Plaza Enters. v. Moon***, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." ***Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.***, 78 S.W.3d 885, 890 (Tenn. 2002). "The court's role in resolving

disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used." *Allstate Ins. Co.*, 195 S.W.3d at 611; *Staubach Retail Services-Southeast LLC v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 526 (Tenn. 2005); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

"Where a trial court hears a case without a jury, we review the amount of damages awarded by the trial court as a question of fact with a presumption of correctness, and will only alter or amend the amount if the trial court utilized the wrong measure of damages or when the evidence preponderates against the amount of damages awarded." *Smith v. Williams*, No. E1999-01346-COA-R3-CV, 2000 WL 277059, at 4 (Tenn. Ct. App. March 15, 2000) (citing Tenn. R. App. P. 13(d)).

## IV. Analysis

Because the damages issues raised by Northwest rest on the liability of TAC, we first address TAC's argument that it did not breach the contract.

A plaintiff alleging breach of contract must prove: "(1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract." *Johnson v. Dattilo*, No. M2010–01967–COA–R3–CV, 2011 WL 2739643, at *5 (Tenn. Ct. App. July 14, 2011) (citing *ARC LifeMed, Inc. v. AMC–Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)).

The parties agree that this contract is enforceable and includes the express provision that TAC will perform the contract in a "workmanlike manner according to standard industry practices." When a construction contract is silent regarding the standard of conduct that applies to the contract's performance, the courts will imply a standard of workmanlike conduct. *See Bowling v. Jones*, 300 S.W.3d 288, 291 (Tenn. Ct. App. 2008) (citing 13 Am.Jur. 2d Building and Construction Contracts § 10 (2000)). However, if the parties choose to employ a different or more specific standard of conduct through the express terms of the contract, the different or more specific standard will apply. *See Johnson*, 2011 WL 2739643, at *5; *Dewberry v. Maddox*, 755 S.W.2d 50, 54 (Tenn. 1988) (citing Dixon v. Mountain City Constr. Co., 632 S.W .2d 538, 541–42 (Tenn. 1982)); *see also Wilkes v. Shaw Enters., LLC*, No. M2006–01014–COA–R3–CV, 2008 WL 695882, at *8 (Tenn. Ct. App. March 14, 2008) ("[T]he implied standard of workmanship did not accompany the construction for the house at issue because the explicit language of the contract provided a different standard."). In this case, the parties specifically agreed to judge what constituted "a workmanlike manner" based on standard industry practices.

Although the contract specifically includes a clause requiring the work to be performed in a workmanlike manner according to standard industry practices, it does not clearly define what that means in the context of this contract. Nonetheless, it is well settled, that, in order to prove a breach of contract based on a failure to perform in a workmanlike manner according to standard industry practices, the plaintiff must prove that "conditions found to be defective by [the plaintiff] fell below the applicable standard." ***Carter v. Krueger***, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995). Northwest must, therefore, prove that the methods employed by TAC in this project constituted a breach of standard industry practices; and, assuming a breach is found, that the breach caused the problems that Northwest has identified. *See **Johnson***, 2011 WL 2739643, at \*5.

The methods employed by TAC are undisputed. TAC performed core samples of the existing asphalt to a depth of two- to three-inches, milled off two-inches of asphalt, then proof rolled with a loaded truck. At this point they became aware of some instability and offered Northwest a choice of either expensive, time-consuming excavation or adding additional asphalt with the overrun agreement. Northwest chose the overrun agreement.

Northwest now argues that TAC breached the warranty to perform in a workmanlike manner according to standard industry practices by failing to inform Northwest of the water in the core samples before milling or to inform them of the unsuitable sub-grade before they agreed to the overrun. However, Northwest failed to present any evidence regarding the standard industry practice in this case. In fact, the only evidence of a standard practice is in favor of TAC: Austin Bateman, the engineer for TAC, stated, in uncontradicted testimony, that the use of the overrun agreement was " a standard practice in these situations." While David Evans stated that, in his opinion, finding water in a core sample was a sign that the project could not be completed properly, this statement was with regard to two- to three-foot core samples that hypothetically could have been taken by an engineer, and did not involve the much more shallow core samples actually taken by TAC. Mr. Evans never testified that continuing to pave after finding water in a two- to three-inch core sample was contrary to the standard industry practice. In fact, he qualified his testimony by stating that he was in the testing rather than the paving business, and that his perspective might be different than that of someone in paving. Other than the above, there was no evidence that the standard industry practice was to inform owners of, or to be concerned by, the presence of water in two- to three-inch core samples. Nor was there any testimony that standard industry practices required TAC to do more extensive testing with regard to subsurface conditions in a paving project or to use less heavy machinery or different access points to pave an area of light-duty asphalt.

As discussed by this Court, in ***Johnson v. Datillo***, which dealt with the standard of "good building practices," "a determination cannot be made that the defects in the house

constitute a breach of the contract resulting from construction that fell below the standard of 'good building practices' because the record is silent regarding [the meaning of] 'good building practices." **Johnson v. Dattilo**, No. M2010–01967–COA–R3–CV, 2011 WL 2739643, at *5 (Tenn. Ct. App. July 14, 2011) (quoting **Wilkes v. Shaw Enters., LLC**, No. M2006–01014–COA–R3–CV, 2008 WL 695882, at *9 (Tenn. Ct. App. March 14, 2008)). The court went on to state that defects pointed out by witnesses for the plaintiff are "immaterial unless it is shown that the conditions found to be defective by them fell below the applicable standard." **Johnson**, 2011 WL 2739643, at *5 (quoting **Carter**, 916 S.W.2d at 935). Simply put, there is no evidence that TAC breached its duty to perform according to standard industry practices because there was no evidence presented of what standard industry practices were applicable in this situation.

The trial court, however, found that implied in the contract in this case is the duty to warn Northwest of any defects in the soil that the contractor knew or should have known. The trial court found that the water in the core samples taken by TAC was enough to put TAC on notice that the sub-grade was unsuitable for the paving project prior to milling, and that failing to warn Northwest of the unsuitable sub-grade amounted to a breach of the provision requiring workmanlike conduct. Accordingly, the trial court found that TAC had breached the contract and awarded damages to Northwest.

Respectfully, we disagree with this finding and conclude that the evidence preponderates against the trial court's finding that TAC was on notice that the sub-grade was unsuitable for the paving project prior to milling. According to the evidence presented at trial, the presence of water in two of the four two- to three-inch core samples was not indicative of a poor sub-grade. The engineer for TAC testified that water in holes left by the core samples was not evidence of moisture in the sub-grade, but was caused by the water cooling system in the drill used to core. TAC's witnesses further stated that finding water in the cores was usual and was no cause for concern. Additionally, TAC's witnesses testified that other indications of moisture in the sub-grade—e.g., alligatoring, surface water on the drag strip, water on the base stone after milling and proof rolling, or water in the test pit—were not present in this case. The only evidence that Northwest introduced to indicate that TAC was put on notice of moisture by the water in the holes left by the core samples was Mr. Taylor's statement in his deposition that water was "bad" and could indicate moisture in the sub-grade. However, Mr. Taylor was merely a salesman for TAC and explained, in his testimony at the hearing, that he did not learn, until after his deposition, that the drill used to cut the core samples put a considerable amount of water onto the ground. Other than Mr. Taylor's deposition testimony, which was negated by his direct testimony, the record is devoid of other evidence that water in two of the four two- to three-inch core samples should have put TAC on notice of moisture in the sub-grade. We are always are hesitant to overturn a trial court's factual findings. However, from our review of the entire record and the totality

of the circumstances, we conclude that the evidence preponderates against the trial court's finding that TAC was put on notice of moisture in the sub-grade by the water found in the holes left by the core samples.

Because we conclude that TAC was not on notice of the moisture in the sub-grade, it is not necessary for us to address the question of whether notice of moisture would have given rise to a duty to warn in this case. Additionally, there was no evidence that standard industry practices required a paver to warn a property owner of water found in holes left from core samples. Accordingly, we conclude that TAC has not breached the express warranty to perform in a workmanlike manner according to standard industry practices.

The trial court also concluded that there was no negligence in this case. Neither party appealed this decision. Although Northwest argued for damages relating to the alleged negligence of TAC in its reply brief, "it is not the office of a reply brief to raise issues on appeal." *Regions Financial Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 392 (Tenn. Ct. App. 2009) (quoting *Gentry v. Gentry*, No. E2000–02714–COA–R3–CV, 2001 WL 839714, at *4 n.3 (Tenn. Ct. App. July 25, 2001)). Therefore, the issue of negligence has been waived. *See Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) (stating that an issue is waived if it is not raised in the statement of the issues, even if the issue is argued in the party's appellate brief).

The trial court made no findings that TAC breached the contract other than its failure to warn, and awarded TAC a credit against the judgment in the amount of $39,500.00. Northwest did not object to this credit in its appellate brief. TAC argues, however, that it should be awarded the entire contract price including the overrun agreement, i.e., $44,918.40. The overrun agreement provides that TAC would apply additional asphalt to obtain "the best paving project possible when paving over the soft sub-grade." According to the testimony, TAC paved the drag strip with all the asphalt that had been purchased by Northwest. As discussed above, there is no testimony that the use of the additional asphalt was contrary to standard industry practices. Therefore, TAC did not breach the overrun agreement. Because Northwest failed to prove that TAC breached the original contract or the overrun agreement, we conclude that TAC is entitled to the full contract price of $44,918.00. Having concluded that TAC did not breach the contract, all issues raised by Northwest are pretermitted.

## IV. Conclusion

The judgment of the trial court is reversed and TAC is awarded a judgment against Northwest in the amount of $44,918.00. Costs of this appeal are assessed to the Appellant Northwest Tennessee Motorsports Park, LLC, and its surety.

_____
J. STEVEN STAFFORD, JUDGE