RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

FRANKLIN AMERICAN MORTGAGE COMPANY,

*Plaintiff-Appellee*,

*v*.

No. 18-5035

THE UNIVERSITY NATIONAL BANK OF LAWRENCE,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:13-cv-01109—Bernard A. Friedman, District Judge.

Argued: October 18, 2018

Decided and Filed: December 6, 2018

Before: MERRITT, COOK, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Anthony V. Narula, AXS LAW GROUP, PLLC, Miami, Florida, for Appellant. Charles M. Cain, II, CAIN LAW FIRM, Franklin, Tennessee, for Appellee. **ON BRIEF:** Anthony V. Narula, AXS LAW GROUP, PLLC, Miami, Florida, for Appellant. Charles M. Cain, II, CAIN LAW FIRM, Franklin, Tennessee, for Appellee.

LARSEN, J., delivered the opinion of the court in which COOK and MERRITT, JJ., joined. MERRITT, J. (pg. 17), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge.   Franklin American Mortgage Company (FAMC) purchased two loans from the University National Bank of Lawrence (UNB) and promptly resold them to Wells Fargo.  Years later, Wells Fargo discovered defects in UNB's underwriting and demanded that FAMC repurchase the loans or indemnify Wells Fargo for its losses.  FAMC similarly demanded that UNB indemnify FAMC for its payments to Wells Fargo in accordance with their agreement. UNB refused.  The district court granted summary judgment to FAMC on its breach of contract claims against UNB.  We now AFFIRM that judgment.

I.

FAMC and UNB entered into a Correspondent Loan Purchase Agreement (Agreement) in 2005, by which FAMC agreed to purchase mortgage loans from UNB.  In exchange, UNB made certain representations and warranties about the loans it would sell, including that "[t]here [would be] no fact or circumstance with respect to the Mortgage Loan that would entitle" a subsequent purchaser "to demand repurchase of a Mortgage Loan" from FAMC.  UNB also agreed to repurchase any mortgage loans if one of its representations or warranties turned out to be false or if a subsequent buyer required that FAMC repurchase the mortgage loan. Additionally, UNB promised to indemnify FAMC for "any and all losses" that FAMC incurred due to "[a]ny misrepresentation" or breach "of any of the . . . representations, warranties, or obligations under this Agreement" by UNB.

The parties agreed that Tennessee law would govern the Agreement.  FAMC and UNB later modified the original Agreement with a Delegated Underwriting Agreement (Modification) in which UNB agreed to perform the underwriting for loans it sold to FAMC.

At issue here are two loans UNB sold to FAMC—one sold in 2006 (the "Salvino Loan") and one sold in 2007 (the "Turner Loan").  Per the parties' arrangement, UNB underwrote both loans.  FAMC promptly resold both to Wells Fargo.  In February and March 2010, Wells Fargo notified FAMC that it had identified defects in the underwriting for both loans, including missing

documents and income miscalculations. After internal appeals in which FAMC disputed some of the defects and tried to resolve others, Wells Fargo demanded that FAMC repurchase the Salvino Loan and indemnify Wells Fargo for its losses arising from the Turner Loan.[1] FAMC did so in November 2010 (Salvino Loan) and August 2011 (Turner Loan), paying Wells Fargo a total of $231,225.33 for the two loans.

After satisfying its repurchase and indemnification obligations to Wells Fargo, FAMC invoked the Agreement to demand repurchase and indemnification from UNB. UNB refused to repurchase the Salvino Loan or indemnify FAMC for either. To cut its losses, FAMC resold the Salvino Loan to a third party for $42,278.48.

In 2013, FAMC filed a complaint alleging that UNB's refusal to repurchase or indemnify had breached their Agreement. FAMC moved for summary judgment on its claims; UNB made a cross-motion for summary judgment on several affirmative defenses, including its claim that the statute of limitations had run. The district court granted summary judgment to FAMC, denied it to UNB, and awarded FAMC $188,858.71 in damages. UNB timely appealed.

II.

The primary issue in this appeal is whether the district court properly denied summary judgment to UNB on its statute of limitations defense (and, relatedly, whether the district court properly granted summary judgment to FAMC despite that defense). We review a district court's summary judgment decision de novo, applying the same standards the district court used. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). In other words, summary judgment is warranted only if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Villegas*, 709 F.3d at 568. In evaluating the evidence presented by the parties, we "view[] the facts and all inferences to be drawn from the facts in the light most favorable to the party against whom summary judgment was entered." *Villegas*, 709 F.3d at 568.

---

[1]Wells Fargo demanded indemnity, rather than repurchase, because the Turner Loan had already been foreclosed or sold short by the time the demand was made.

UNB argues that FAMC's breach of contract claims are time-barred because they accrued in 2006 and 2007, when FAMC purchased the loans from UNB. The claims accrued at this time, says UNB, because UNB made the allegedly false representations and warranties at the time of purchase. UNB further argues that the Agreement's repurchase and indemnification provisions did not create any independent obligations accruing after the purchase date; these provisions instead simply provided alternative remedies for any breach of warranty. In support of its view, UNB points to a body of cases addressing this precise issue—mortgage repurchase provisions—under New York law. *See, e.g.*, *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 626–31 (N.Y. 2015) (holding that claims for breach of contract accrued when the misrepresentations were made—the original purchase date—rather than on the date the seller refused to repurchase). UNB would have us apply the same reasoning under Tennessee law and hold that the causes of action here accrued in 2006 and 2007, when FAMC purchased the defective Salvino and Turner loans. This would mean that Kansas' five-year statute of limitations barred FAMC's 2013 complaint.[2]

FAMC argues in response that the causes of action accrued in 2010 and 2011, rather than in 2006 and 2007. FAMC reminds us that the New York cases are inapplicable to contracts governed by Tennessee law, and points to cases resolving related issues differently under Delaware, Missouri, and Minnesota law. *See, e.g.*, *Bank of N.Y. Mellon v. WMC Mortg., LLC*, 50 Misc.3d 229, 235 (N.Y. Sup. Ct. 2015) (noting that Delaware and Minnesota courts have declined to follow New York's approach to accrual-delaying provisions), *aff'd as modified*, 56 N.Y.S.3d 1 (N.Y. App. Div. 2017); *Citimortgage, Inc. v. Chi. Bancorp, Inc.*, No. 4:14-cv-01278, 2016 WL 3346566, at *7–8 (E.D. Mo. June 16, 2016) (holding that the statute of limitations runs from the date of the repurchase demand), *vacated in part*, 2016 WL 3958594 (E.D. Mo. July 22, 2016). FAMC concedes that Tennessee has not addressed this precise

---

[2]Although Tennessee law applies to the Agreement generally and has a longer six-year statute of limitations, *see* Tenn. Code Ann. § 28-3-109(a), UNB argues that the Kansas statute of limitations, Kan. Stat. Ann. § 60-511, applies here because of Tennessee's borrowing statute. *See* Tenn. Code Ann. § 28-1-112. Under the borrowing statute, a second state's statute of limitations applies (rather than Tennessee's) if: (1) the defendant was a resident of the second state when the cause of action accrued; (2) the cause of action is barred by the second state's limitations period; and (3) the cause of action accrued in the second state. *Id.*; *see McNew v. People's Bank of Ewing*, 999 F.2d 540, at *4 (6th Cir. 1993) (table). According to UNB, all three elements were satisfied here and Kansas' shorter statute of limitations applies.

question.     Nevertheless, FAMC argues that under Tennessee law the repurchase and indemnification provisions created independent contractual obligations.     Therefore, FAMC concludes, the causes of action for breach did not accrue until 2010 and 2011, when FAMC incurred its losses, and the 2013 complaint is timely regardless of whether the Tennessee or Kansas statute of limitations applies.

We are not convinced that Tennessee law would treat repurchase provisions any differently than New York law.  FAMC has not identified any substantive differences between Tennessee and New York contract law that would lead to the conclusion that *ACE Securities*' reasoning should not apply to the repurchase provisions of the contract.  But we affirm the result below nonetheless because FAMC also alleged breaches of the Agreement's indemnification provision, which falls squarely into *ACE Securities*' exception for contractual agreements that "undertake a separate obligation, the breach of which does not arise until some future date." 36 N.E.3d at 628.

In *ACE Securities*, the buyer of numerous mortgage loans demanded that the seller repurchase defective loans, as they had agreed.  *Id.* at 626.  When the seller refused, the buyer sued for damages.  *Id.* at 626–27.  The New York Court of Appeals agreed with the seller's statute of limitations argument, holding that the breach of contract claims accrued when the misrepresentations were made—the original purchase date.  *Id.* at 627–30.  The court observed that "parties may contractually agree to undertake a separate obligation, the breach of which does not arise until some future date," but determined that the repurchase provision at issue there did not create such an obligation.  *Id.* at 628.  Rather, the repurchase clause was only a remedial provision.  "The cure or repurchase obligation is an alternative remedy, or recourse, for the [buyer], but the underlying *act* the [buyer] complains of is the same:  the quality of the loans and their conformity with the representations and warranties."  *Id.* at 630 (emphasis in original).

The repurchase provision in this Agreement is similar in all material respects to the one analyzed in *ACE Securities*.  Therefore, FAMC cannot assert a claim for breach of the repurchase protocol separate from the alleged breaches of the representations and warranties, and any such claim would have accrued on the date those representations and warranties were made—at purchase, in 2006 and 2007.  *Id.* at 629.  That conclusion does not end our inquiry,

however, because FAMC also alleged breaches of the Agreement's indemnification provision. Pursuant to the indemnification provision, UNB agreed that it would "indemnify [FAMC] and . . . hold [FAMC], it[s] officers, directors, and shareholders harmless from and against any and all losses, liabilities, penalties, damages, or other harm or injury" that FAMC might suffer because of UNB's error or misconduct. The Agreement also underscores the independent and distinct nature of the indemnification obligation, stating the obligation exists "[i]n addition to the repurchase obligation of [UNB] and all other rights and remedies available to [FAMC]" and "shall survive any termination of the Agreement." That distinguishes the indemnification provision here from the repurchase provision in *ACE Securities*, which the court said "could not reasonably be viewed as a distinct promise of future performance," in part because "nothing in the contract specified that the cure or repurchase obligation would continue for the life of the loans." *Id.* Here, by contrast, the Agreement on its face demonstrates that FAMC and UNB intended to "shift[] the entire burden of loss or responsibility" to UNB, even after the rest of the Agreement no longer had effect. *Triangle Am. Homes v. Harrison*, No. E2009-01954, 2011 WL 4863713, at *9 (Tenn. Ct. App. Oct. 13, 2011) (quoting *Winter v. Smith*, 914 S.W.2d 527, 542 (Tenn. Ct. App. 1995)).

The common law of indemnification lends support to our determination that the indemnification provision here created "a separate obligation, the breach of which does not arise until some future date." *ACE Sec.*, 36 N.E.3d at 628. Under well-established common law principles, "the liability of the indemnitor does not accrue until the indemnitee has actually paid an obligation for which the indemnitee has been found liable." *Long v. McAllister-Long*, 221 S.W.3d 1, 11 (Tenn. Ct. App. 2006); *Stiver Mktg., Inc. v. Performance Bus. Forms, Inc.*, No. 01-A-019108CH00276, 1991 WL 254564, at *4 (Tenn. Ct. App. Dec. 4, 1991) ("Generally, the right to sue for indemnity for damages . . . accrues only when payment has been legally made by the indemnitee. Thus, the right does not arise until the indemnitee has actually sustained or suffered loss; either through payment, settlement, or through the injured party's obtaining an enforceable judgment." (quotation marks omitted)). That is true even when the indemnity obligation arises from a contractual provision. *Long*, 221 S.W.3d at 11 (stating that the above accrual rule applies "[i]n the context of an agreement to indemnify against loss"); *Raleigh Commons, Inc. v. SWH, LLC*, No. W2011-01298, 2013 WL 3329016, at *6 (Tenn. Ct. App. June

28, 2013) (stating that a payment to a third party "gave rise to an immediate right to indemnification" under the contract at issue).**3** We conclude that the text of this indemnification provision indicates an intention to invoke the longstanding common law principles of indemnification, including its accrual rules.  It is true, as UNB argues, that there are "separate substantive cause[s] of action" for indemnification.  *See Lehman Bros. Holdings, Inc. v. Universal Am. Mortg. Co., LLC*, 660 F. App'x 554, 567 (10th Cir. 2016).  That is exactly why the Agreement's indemnification provisions created a distinct obligation—the Agreement invoked those "separate substantive" principles to create a separate and independent contractual obligation, which would accrue at the time that FAMC suffered a loss.

UNB argues that even if we characterize the claims as indemnification claims, the claims still would have accrued on the date FAMC purchased the loans.  But that takes *ACE Securities* too far.  Even under New York law, *ACE Securities*' accrual rule would not apply to indemnification provisions.  The New York cases themselves do not discuss indemnification claims; the plaintiffs there had not asserted any.  Nor could they have done so.  The New York plaintiffs were trusts that had purchased and then pooled thousands of mortgage loans in order to sell residential mortgage-backed securities.  When the mortgage borrowers defaulted or the trusts themselves discovered defects, the trusts sought repurchase to cut their losses.  But since the trusts had not re-sold the actual loans to any third parties, there would have been no viable indemnification claims—just claims for breaches of the mortgages' warranties and representations.  *See, e.g.*, *ACE Sec.*, 36 N.E.3d at 624–28 (no mention of indemnification); *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861 (2d Cir. 2015) (same); *U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Markets*, 643 F. App'x 48 (2d Cir. 2016) (same);

---

**3**UNB supports its argument that any indemnification claims accrued immediately at purchase by pointing to deposition testimony from FAMC's corporate representative, admitting that the loans were defective at the time of purchase.  Therefore, UNB says, FAMC could have immediately sought indemnification from UNB and any cause of action must have accrued at that time.  But that is not true.  Tennessee law dictates that a right to contractual indemnification would arise only when FAMC "actually sustained or suffered loss; either through payment, settlement, or through the injured party's obtaining an enforceable judgment."  *Stiver*, 1991 WL 254564, at *4 (quotation marks omitted).  While the loans may have been defective at the time of purchase (and less valuable generally), FAMC had not yet been required to make any payments to any third parties, and thus had not incurred any "actual[] . . . loss," *id.*, that would trigger UNB's contractual indemnification obligation.  In fact, as the district court noted, FAMC made a profit off the two loans when it bought and then immediately resold them to Wells Fargo.  So the deposition testimony does not alter our analysis.

*Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A.*, 643 F. App'x 44 (2d Cir. 2016) (same); *Lehman XS Tr., Series 2006-4N v. Greenpoint Mortg. Funding, Inc.*, 643 F. App'x 14 (2d Cir. 2016) (same). Subsequent New York cases confirm our deduction.

For example, in *Hometrust Mortgage Company v. Lehman Brothers Holdings, Inc.*, the federal court distinguished *ACE Securities,* stating that "[i]t is black letter law in New York that indemnification claims do not accrue until the liability to a third-party is fixed, or payment is made—in this case when LBHI settled with Fannie Mae and Freddie Mac in 2014." Nos. 15-CV-4060, 15-CV-4061, 2015 WL 5674899, at *2 (S.D.N.Y. Sept. 25, 2015) (citing *McDermott v. City of N.Y.*, 406 N.E.2d 460, 462 (N.Y. 1980)). The district court rejected the argument that *ACE Securities* applied to indemnification accrual, explaining that *ACE Securities* "involved claims for the repurchase of loans, not indemnification for liability to third parties." *Id.* at *3; *see also Lehman XS Tr. v. Greenpoint Mortg. Funding, Inc.*, Nos. 12-cv-7935, 12-cv-7942, 12-cv-7943, 2017 WL 1293773, at *6–7 (S.D.N.Y. Mar. 29, 2017) (distinguishing between repurchase claims and claims for indemnification arising from payments to a third party). *ACE Securities* does not alter indemnification principles, even under New York law.

UNB also contends that we cannot apply the indemnification accrual rule because FAMC pleaded breach of contract claims, not indemnification claims. UNB is right that FAMC's complaint titles its causes of action "Count One – Breach of Contract – Salvino Loan" and "Count Two – Breach of Contract – Turner Loan." But FAMC's amended complaint also alleges that the Agreement included a contractual indemnification obligation; that Wells Fargo demanded payment from FAMC as a result of UNB's errors; and that FAMC suffered losses when it made those payments to Wells Fargo. The causes of action themselves plainly state that "UNB has breached its contractual obligations *to indemnify FAMC for its losses*" arising from the two loans. And "[i]n Tennessee, the applicable statute of limitations is determined by the gravamen of the complaint rather than a plaintiff's designation of a claim." *Nissan N. Am., Inc. v. Schrader Elecs., Ltd.*, No. 3:13-CV-0180, 2013 WL 3778729, at *5 (M.D. Tenn. July 18, 2013) (citing *Pera v. Kroger*, 674 S.W.2d 715, 719 (Tenn. 1984)). Because we conclude that the indemnification provision created "a separate obligation," we also conclude that the parties agreed that the breach of this obligation would "not arise until some future date." *ACE Sec.*,

36 N.E.3d at 628. This conclusion necessarily follows from the Agreement itself; UNB agreed to indemnify FAMC for "any and all losses, liabilities, penalties, damages, or other harm or injury that [FAMC] may incur." This would be meaningless unless the parties also agreed that the claim for breach would arise only at the future date when FAMC actually suffered those losses.

The Tenth Circuit's opinion in *Lehman Brothers Holdings, Inc. v. Universal American Mortgage Company, LLC* does not change our conclusion. There, the court declined to characterize causes of action labeled "breach of contract" as indemnification claims. *Lehman Bros.*, 660 F. App'x at 566–68. But the point in *Lehman Brothers* was not that the plaintiffs had labeled their causes of action "breach of contract." The insurmountable issue there was that despite filing five amended complaints, the *Lehman Brothers* plaintiffs never alleged "any payment by Lehman Holdings to a third party," which is an essential part of an indemnification claim. *Id.* at 567–68. The Tenth Circuit saw that the plaintiffs were not pursuing indemnification—reimbursement for payments to third parties—but rather were seeking run-of-the-mill contract damages for injuries the defendants' breaches had caused them. *Id.* at 567–68.[4] Here, on the other hand, FAMC's complaint on its face shows that FAMC is pursuing reimbursement for the damages it suffered when it paid Wells Fargo for the defective loans. It

---

[4]The Tenth Circuit also based its conclusion in part on what seems to us to be a mistaken reading of New York law. *Lehman Brothers* quotes a New York Appellate Division case, *City of New York v. Lead Industries Association, Inc.*, 644 N.Y.S.2d 919 (N.Y. App. Div. 1996) (per curiam), for the proposition that an indemnity claim is only viable when "the plaintiff alleges that the defendant owed a duty to a third party rather than to the plaintiff itself." 660 F. App'x at 568 (citing *Lead Indus. Ass'n*, 644 N.Y.S.2d at 923–24). But indemnity obligations may be either express (i.e., contractual) or implied for equitable reasons. *See, e.g.*, Restatement (Third) of Torts: Apportionment Liab. § 22 (Am. Law Inst. 2000); *Med. Protective Co. v. Bolick*, No. 2:15-CV-322, 2016 WL 5172282, at *4 (E.D. Tenn. Sept. 19, 2016) ("Under Tennessee law, an obligation to indemnify may arise expressly by contract between the parties or impliedly from the parties' relationship." (citing *Houseboating Corp. of Am. v. Marshall*, 553 S.W.2d 588, 589 (Tenn. 1977))); *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir. 1986) (discussing the circumstances under which New York law implies indemnification obligations in the absence of an express agreement).

*Lead Industries Association* discussed duties to third parties in the context of deciding whether the court should imply an equitable indemnification obligation—specifically, whether lead manufacturers should reimburse New York City for the costs incurred in removing lead paint from public buildings. The reasoning in *Yemen* on which *Lehman Brothers* relies is inapplicable to contractual indemnification for the same reasons; *Yemen* discussed whether an implied right to indemnification was appropriate where "there is no express agreement creating a right to indemnification." 782 F.2d at 351. We do not read these cases to alter the longstanding principle that "[a] party is entitled to contractual indemnification when the intention to indemnify" is clear from an agreement. *Centennial Contractors Enters. v. E. N.Y. Renovation Corp.*, 79 A.D.3d 690, 692 (N.Y. App. Div. 2010) (quotation omitted).

argued indemnification to the district court; indeed, the district court's summary judgment order relied on FAMC's evidence that UNB had failed to fulfill its express indemnity obligation. We therefore conclude that FAMC properly pleaded contractual indemnity claims for statute of limitations (and accrual) purposes.

As its last line of defense, UNB asserts that FAMC has no indemnification claims because the Modification executed by the parties (in which UNB agreed to underwrite loans it sold to FAMC) limited the remedies available to FAMC. UNB points to language in the Modification stating that "[UNB] shall repurchase any loan purchased by [FAMC] hereunder, subject to the terms of" the Agreement's repurchase provision. UNB would have us believe that this language amended the original Agreement to eliminate all remedies except repurchase because otherwise the language would merely restate a preexisting obligation and would be superfluous.

We disagree. For one thing, we concluded above that the indemnification provision is not a mere remedial provision; it creates a separate, distinct obligation. Even so, the Modification did not abrogate the Agreement's indemnification provision. The Modification stated that it would "supplement and[,] to the extent inconsistent, modify" the original Agreement. It made clear that the original Agreement "shall remain in full force and effect as supplemented and modified hereby." Nothing in the Modification, including the provision highlighted by UNB, indicates any intention to limit FAMC's remedies to repurchase alone. And the "shall repurchase" language is not inconsistent with the Agreement's indemnification obligations, which were explicitly "[i]n addition to the repurchase obligation . . . and any and all other rights and remedies available." We acknowledge that this Modification language thus merely restates UNB's preexisting repurchase obligation. But there is no general prohibition against redundant contract language. *See TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 577–78 (6th Cir. 2010). "[T]he rule that courts should interpret contracts to avoid superfluous words is a tool for dealing with ambiguity, not a tool for *creating* ambiguity in the first place." *Gallo v. Moen Inc.*, 813 F.3d 265, 273 (6th Cir. 2016) (emphasis in original) (quotation marks omitted). The Modification's "shall repurchase" language is not ambiguous, and we decline to create an

ambiguity.  We conclude, therefore, that the Modification did not eliminate the Agreement's indemnification obligations.

The district court correctly concluded that FAMC's claims as to the Salvino and Turner Loans accrued in 2010 and 2011, respectively.  The 2013 complaint was, therefore, filed well within the limitations period, regardless of whether Kansas's five-year or Tennessee's six-year limitations period applies.  Accordingly, we need not address UNB's arguments regarding repurchase provisions or decide whether Tennessee law recognizes a discovery rule that would toll the limitations period for breach of contract actions.

## III.

Having resolved UNB's most compelling argument in FAMC's favor, we can now easily resolve the rest.

## A.

UNB first asserts that FAMC produced insufficient evidence of breach and causation for summary judgment.  We disagree.  In Tennessee, a "plaintiff alleging breach of contract must prove:  (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract."  *Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co.*, 410 S.W.3d 810, 816–17 (Tenn. Ct. App. 2011) (quotation marks omitted).  A party moving for summary judgment must marshal the evidence in the record to "show[] that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Both sides admitted the existence of an enforceable contract.  FAMC pointed to evidence in the record sufficient to show it suffered losses as a result of misrepresentations and miscalculations made by UNB in its underwriting.  FAMC's evidence demonstrated that based on these defects, Wells Fargo demanded and received payment from FAMC.  Finally, FAMC showed that UNB breached the Agreement by failing to indemnify FAMC for its losses and presented evidence of the exact amount of the damages caused.

With this evidence, FAMC "met its burden of raising sufficient facts to entitle its motion to be granted as a matter of law under Rule 56(c)." *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007). It then fell to UNB "to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). But UNB's response to FAMC's motion for summary judgment did not directly address the evidence presented in FAMC's motion. Rather, UNB focused mainly on the same affirmative defenses and other ultimately unpersuasive arguments on which its appellate brief focused. Therefore, the district court correctly granted summary judgment to FAMC on the first and second elements of both causes of action (the existence of an enforceable contract, and breach). *See* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

UNB next argues that there was a genuine issue of material fact regarding whether there actually were "material misrepresentations" in the loan documents, saying that "the parties dispute whether the Salvinos and the Turners made material misrepresentations on their loan applications." UNB speculates that both loans might have been approved by the loan underwriting program anyway, even if there were no misrepresentations, so any breach was not material. According to UNB, to prove the misrepresentations, FAMC needed to "present . . . evidence to contradict the borrowers' certifications under penalty of perjury that the information in their loan applications were true and correct." But this argument misses the mark entirely.

The relevant issue is not whether the Salvinos and Turners committed fraud, but whether the underwriting measured up to the standard required by the parties' agreements. FAMC presented more than enough evidence to show that the underwriting performed by UNB was deficient; the incomes had been miscalculated, and documents required to verify the homeowners' incomes were missing. This evidence directly contradicts UNB's contractual representation that "no fact or circumstance with respect to the Mortgage Loan" existed "that would entitle" a subsequent purchaser "to demand repurchase of a Mortgage Loan." And whether or not the loans at issue "would still . . . have qualified for approval" absent these

defects is beside the point. There *were* defects, and those defects entitled Wells Fargo to demand payment from FAMC. Pursuant to the Agreement, UNB had an obligation to indemnify FAMC for these payments. Furthermore, FAMC presented evidence (never addressed by UNB) to show that the Turner Loan's mortgage insurance had been rescinded, in breach of UNB's warranty that it had (and would continue to have) such insurance.

Calling the alleged defects "insignificant technicalities," UNB asserts that the Agreement "does not impose *strict liability* on UNB," but "rather a defect must be *material* to rise to the level of triggering an actionable claim." But we search in vain for any contractual language that would support UNB's position. In some portions of the Agreement, the parties did use the word "material" to qualify their obligations. For example, the Agreement required repurchase if "[a] post-closing quality control review" revealed "any *material* fraud or misrepresentation." There was no such limitation in the indemnification provision. Rather, UNB broadly agreed to indemnify FAMC for "*any and all* losses . . . arising out of . . . *[a]ny* misrepresentation" by UNB or "*[a]ny* breach" of UNB's "representations, warranties, or obligations under this Agreement." We cannot infer a materiality requirement at odds with the indemnification provision's text. *See Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) ("The literal meaning of the contract language controls if the language is clear and unambiguous.").

Finally, UNB failed to present evidence creating a genuine issue of material fact about whether Wells Fargo demanded repurchase *because of* the defects. UNB pointed to testimony from FAMC's corporate representative, for example, that because of the economic climate of the time, "not every instance of a default or delinquency with regard to these loans necessarily flowed from some poor quality underwriting." But that evidence does not show that something besides the loan defects caused Wells Fargo's repurchase and indemnification demands, and is insufficient to create a genuine issue of material fact. *See, e.g.*, *Wilson v. Cleveland Clinic Found.*, 579 F. App'x 392, 403 (6th Cir. 2014) ("Evidence that is merely colorable or not significantly probative is not sufficient . . . ."). Similarly, UNB claims that the misrepresentations did not actually cause any damages or trigger the indemnity obligations because FAMC simply complied with Wells Fargo's demands, ostensibly in order to preserve goodwill with its largest purchaser. But UNB failed to point to any concrete evidence to show

that this is true generally, and likewise has not shown that this case's particular repurchase and indemnity demands were paid merely out of obeisance to Wells Fargo.  To the contrary, FAMC presented evidence showing that it appealed the demands within Wells Fargo's internal appeals process.  In sum, summary judgment on both the breach and causation issues was appropriate.[5]

B.

Next, UNB argues that there is a genuine issue of material fact over whether FAMC properly mitigated its damages when, following UNB's refusal to repurchase the Salvino Loan, FAMC resold the loan at a significant discount.[6]  The problem for UNB is that failure to mitigate damages is an affirmative defense.  *Aqua-Chem, Inc. v. D&H Mach. Serv., Inc.*, No. E2015-01818-COA-R3-CV, 2016 WL 6078566, at *5 (Tenn. Ct. App. May 26, 2016).  UNB thus bears the burden of presenting evidence sufficient to demonstrate a genuine issue of material fact as to whether FAMC's mitigation efforts were reasonable.  *See Great Am. Ins. Co. v. E.L. Bailey & Co., Inc.*, 841 F.3d 439, 445 (6th Cir. 2016) ("[A]s an affirmative defense, [Defendants] bore the burden of pleading and substantiating the issue to place it in dispute." (quotation marks

---

[5]UNB also argues that it cannot be required to indemnify FAMC for Salvino Loan losses because Wells Fargo, after purchasing the Salvino Loan from FAMC, executed a "Loan Modification Agreement" with the borrowers.  According to UNB, this created a new loan not subject to the original Agreement between UNB and FAMC.  Not so.  The document calls itself a "Loan Modification Agreement," and explicitly states that "except as otherwise specifically stated in this Agreement, the original Note and Mortgage"—the Salvino Loan—"will remain unchanged."  UNB points out that FAMC's corporate representative called the as-modified Salvino Loan a "new, different loan," but that is irrelevant to our analysis.  Where the contract language "is clear and unambiguous, the literal meaning controls the outcome of the dispute" because it is the best indicator of the parties' intent.  *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703–04 (Tenn. 2008).  FAMC was not a party to the "Loan Modification Agreement" between Wells Fargo and the Salvinos, and so the FAMC corporate representative's opinion is immaterial.  *See Riverside Surgery Ctr., LLC v. Methodist Health Sys., Inc.*, 182 S.W.3d 805, 811 (Tenn. Ct. App. 2005) (stating that contract interpretation seeks to "determin[e] the intent of the contracting parties").  We conclude, based on the contractual language, that the Salvino Loan remained in effect and subject to the original Agreement.

[6]On the issue of damages, UNB makes a preliminary assertion that the district court should not even have considered FAMC's damages argument because its memorandum exceeded the page limit established by previous order.  We review denials of motions to strike under an abuse of discretion standard.  *Cf. Operating Eng'rs Local 324 Health Care Plan v. G&W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015); *Rodgers v. La. Bd. of Nursing*, 665 F. App'x 326, 328 (5th Cir. 2017).  But besides saying that the district court should have stricken FAMC's damages discussion, UNB presents no argument or evidence to indicate that this decision was an abuse of discretion.  UNB does not even dispute the district court's explicit determination that the motion was moot.  Therefore, this issue has been inadequately briefed, and we do not consider it.  *See United States v. Wright*, 747 F.3d 399, 415–16 (6th Cir. 2014); *Benge v. Johnson*, 474 F.3d 236, 245 (6th Cir. 2007).

omitted)).  And UNB failed to produce or point to any concrete evidence showing that FAMC's mitigation efforts were unreasonable.

Rather, in both its response to FAMC's summary judgment motion and its brief on appeal, UNB merely described FAMC's resale process and then asked a series of questions about that process.  For example, UNB asked why FAMC did not get an appraisal of the Salvino Loan; whether the amount of FAMC's payment to Wells Fargo was reasonable; whether FAMC requested supporting documents or clarification of vague or non-descriptive line items in Wells Fargo's expense statement; and why FAMC never "pursued the borrowers for deficiency judgments."  UNB points to deposition testimony where FAMC's representative stated that FAMC had not taken such steps.  But that, without more, is simply insufficient to create a genuine issue of material fact.

To avoid summary judgment, UNB needed to do more than suggest possible problems with FAMC's mitigation.  UNB needed to present and point to evidence that affirmatively demonstrated FAMC's mitigation efforts were not reasonable.  For example, expert testimony on what the appraisal value of the property would have been might have been sufficient to create a genuine issue of material fact; simply asking why no appraisal was done is certainly not enough.  Expert testimony that industry custom dictates certain mitigation steps perhaps could create a genuine issue of material fact; simply pointing out that FAMC had not taken certain steps cannot.  Under Rule 56(e), UNB needed to "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The district court here correctly observed that UNB failed to present evidence showing that FAMC's process was unreasonable, and so there was no genuine issue of material fact.  Summary judgment on the issue of damages was appropriate.

## C.

Finally, UNB contends that summary judgment for FAMC was improper because FAMC's original motion for summary judgment failed to directly address the twenty-four affirmative defenses that UNB raised in its answer.  We find no merit to this argument.  Rather, as the party asserting the affirmative defenses, UNB bore the burden of proof on all twenty-four.

*Beck-Wilson v. Principi*, 441 F.3d 353, 361 (6th Cir. 2006); *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013) ("The burden of proof will not shift to the plaintiff on an affirmative defense absent the defendant first discharging the initial burden." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970))). This means that FAMC was not required to preemptively address all of UNB's pleaded affirmative defenses.

\* \* \*

For the above reasons, we AFFIRM the district court's order granting summary judgment to FAMC and denying summary judgment to UNB.

―――――――――

**CONCURRENCE**

―――――――――

MERRITT, Circuit Judge, concurring.  I concur in the panel's approach to the indemnity aspect of this case.  We conclude that "[t]he 2013 complaint was, therefore, filed well within the limitations period, regardless of whether Kansas's five-year or Tennessee's six-year limitations period applies."  But we do not address whether Tennessee law recognizes a discovery rule that would toll the statute of limitations for breach of contract.  The discovery rule is another basis for the same result — the one used by the District Court.

The District Court concluded that plaintiff Franklin American's claims accrued in Tennessee and that Tennessee's statute of limitations applied.  *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, No. 3:13-CV-01109, 2017 WL 6405595, at *5 (M.D. Tenn. Dec. 14, 2017).  The District Court proceeded to reason that even if we cannot treat plaintiff's claims under different sections of the contract separately, then Tennessee law still tolled the statute of limitation because the breach was inherently undiscoverable by Franklin American.  *Id.* at *6 (citing *Goot v. Metro. Gov't of Nashville & Davidson Cty.*, No. M200302013COAR3CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005) ("[I]t would be unjust to hold that a plaintiff's claim for breach of contract accrues before the plaintiff knew or should have known that the contract had been breached.")).