NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0125n.06

No. 21-3822

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 21, 2022
DEBORAH S. HUNT, Clerk

KEVIN DARAGO,                                )

     Plaintiff-Appellant,          )

v.                                  )     ON APPEAL FROM THE
                                      )     UNITED STATES DISTRICT
LIVE NATION WORLDWIDE, INC., BRING THE  )     COURT FOR THE
AWESOME, INC., MARK HOPPUS, TRAVIS  )     NORTHERN DISTRICT OF
BARKER, MATT SKIBA,               )     OHIO
                                        )

     Defendants-Appellees.       )

Before: SILER, LARSEN, and MURPHY, Circuit Judges.

LARSEN, Circuit Judge. Kevin Darago performed security at Blossom Music Center, an outdoor amphitheater that hosts concerts and is operated by Live Nation Worldwide, Inc. Part of his job was to stop crowd surfers. Unfortunately, during a blink-182 concert, a crowd surfer kicked him in the face while he attempted to stop her, resulting in vision loss. He sued the band and its touring company for negligence. The district court granted summary judgment to the defendants. We AFFIRM.

**I.**

Blossom Music Center is an outdoor amphitheater in Cuyahoga Falls, Ohio, operated by Live Nation. Live Nation employed Darago, part time during the summers, to perform crowd management for concerts at Blossom.

On August 9, 2016, blink-182, a pop-punk band composed of defendants Mark Hoppus, Travis Barker, and Matt Skiba, headlined a concert at Blossom. The band toured under a touring corporation, defendant Bring the Awesome, Inc. (BTAI).

BTAI hired NPB Companies, Inc. to provide personal security for the band during its 2016 tour. BTAI and NPB agreed to have Anthony Robinson, an NPB employee, serve as Security Director for the band. Robinson's job was to protect the band. Live Nation, on other hand, ensured the safety of its employees and guests.

Before a concert at Blossom, a band's touring personnel will often meet with Live Nation management to discuss the production and any unique security issues the band might have. Robinson did just that. He met with Ronald Tynan, Blossom's General Manager, and Craig Taylor, Blossom's Venue Security Manager, before blink-182's concert. At the meeting, Robinson told them to "[b]e aware of" crowd surfing because it would happen. Tynan and Taylor explained that Live Nation prohibited crowd surfing. Robinson said he understood but was merely warning them that it would happen. Robinson also gave Tynan and Taylor a "security rider," a list of various requests from blink-182 for the show. The rider stated that blink-182 also prohibited crowd surfing.

Following this meeting, Taylor met with Blossom's crowd-management staff and briefed them on expectations for the event. Darago didn't attend, but his co-worker John Tussey did. Taylor shared Robinson's warning with the staff: "Be aware of possible crowd surfing."

When Darago arrived for work at Blossom the night of the concert, he went straight to the "pit" where he usually worked. The pit is the standing-room-only area of the amphitheater in front of the stage and is separated from the stage by a metal barricade. Darago's job was to ensure no

one got behind the barricade and onto the stage. He would also receive crowd surfers and help them back down to the ground.

Tussey filled Darago in on the staff briefing, explaining that they were "probably going to have crowd surfing." At this point, Darago and Tussey claim that Robinson approached their group of security personnel. Robinson allegedly told them to allow crowd surfing and "let the kids have fun." Although Darago pointed out that Blossom's policy prohibited crowd surfing, Robinson still said "to allow it to happen." Robinson claims he never said this. After Robinson walked away, Taylor approached the group. Tussey told Taylor that Robinson had said to allow crowd surfing. Taylor responded, "Well, I guess we've got to let 'em have fun."

As the concert began, there were "one or two" crowd surfers. But as "[b]link started really getting into their music," Darago and Tussey claim that the band told the crowd, "Come on, let's get this thing started." That "whipped" the crowd up, causing a lot more people to start crowd surfing. One woman crowd surfed multiple times up to the barricade. After Darago helped her to the ground for the third time, he told Tussey that they needed "to get rid of her." Darago and Tussey claim that Robinson approached them again and told them to let her return to the pit. Unfortunately, she crowd surfed again. The last time, as Darago helped her to the ground, she suddenly kicked him in the eye. As a result, Darago went blind in his left eye and has a large blind spot in the right.

Darago then filed for workers' compensation benefits, which he received. He also sued several defendants, including Live Nation, BTAI, and the individual band members, in state court, alleging several state law tort claims. Darago did not name NPB or Robinson as defendants. The defendants removed the action to federal court, invoking diversity jurisdiction.

Because Darago received his workers' compensation benefits, the district court found that Live Nation, as Darago's employer, was immune from suit under Ohio law. Darago doesn't challenge that finding on appeal. BTAI and the individual band members (collectively "blink-182") moved for summary judgment, and the district court granted their motion. First, the court found that blink-182 could not be liable for premises liability because they had no power to admit or exclude people from Blossom. Second, the court determined that blink-182 could not be liable for negligent hiring and supervision because Robinson lacked an employment relationship with them. Third, the court found that blink-182 could not be vicariously liable for Robinson's actions because Robinson was an independent contractor; nor could they be liable under an agency theory because they never represented to Darago that Robinson was their agent. The court also found that Darago failed to show that Robinson was negligent. Finally, the court explained that blink-182 could not be liable under any tort theory because Darago did not establish that blink-182 proximately caused his injuries. Darago now appeals.

**II.**

We review the district court's summary judgment decision de novo. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). "[S]ummary judgment is warranted only if 'there is no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a) and *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). Darago appeals the district court's determination on the following claims: supervisory liability, negligent hiring and supervision, and premises liability. We address these in turn.

## A. Supervisory Liability

Ohio law holds employers "liable for the negligent acts of [their] employees committed within the scope of employment," but generally not for those of independent contractors. *Pusey v. Bator*, 762 N.E.2d 968, 972 (Ohio 2002). "The chief test in determining whether one is an employee or an independent contractor is the right to control the manner or means of performing the work." *Id.* (quoting *Bobik v. Indus. Comm'n*, 64 N.E.2d 829, 829 (Ohio 1946)). If the employer exercises control, then an employer-employee relationship exists. *Id.* But if "the work is left to one responsible to the employer for the result alone," then an independent-contractor relationship exists. *Id.*

Robinson was, at best, an independent contractor because blink-182 did not exercise control over the manner of his work. Robinson remained at all times an employee of NPB. Blink-182 did not pay Robinson directly; NPB did. And Robinson received his training from NPB. While blink-182 could make suggestions regarding security, neither NPB nor Robinson was required to follow them. Blink-182 never interfered with Robinson's work, other than by instructing him not to permit crowd surfing; instead, they left Robinson alone to handle security because he was an "expert[]." Even Darago admits that blink-182 "did not control Robinson's day-to-day operations with regard to how security should be implemented." So Darago has failed to show that Robinson was blink-182's employee.

Darago next argues that blink-182 is liable for Robinson's negligence under the "loaned-servant doctrine" because NPB loaned Robinson to blink-182. *See Halkias v. Wilkoff Co.*, 47 N.E.2d 199, 205–06 (Ohio 1943), *overruled on other grounds by Helmick v. Republic-Franklin Ins. Co.*, 529 N.E.2d 464, 467 (Ohio 1988). Under this doctrine, "when one employer lends his employee to another for a particular employment, the employee, for anything done in that

employment, must be dealt with as the employee of the one to whom he has been lent, although he remains the general employee of the loaning employer." *Ferguson v. Dyer*, 777 N.E.2d 850, 852 (Ohio Ct. App. 2002); *see also Halkias*, 47 N.E.2d at 205. So the borrowing employer may be vicariously liable for the acts of the loaned employee. *Halkias*, 47 N.E.2d at 205. Darago, however, forfeited this argument by failing to raise it below. *See Sheet Metal Workers' Health & Welfare Fund of N.C. v. Law Off. of Michael A. DeMayo, LLP*, 21 F.4th 350, 355 (6th Cir. 2021). And, in any event, whether one is a loaned servant turns on the same test used to determine whether one is an independent contractor: control. *See, e.g.*, *Ferguson*, 777 N.E.2d at 853. And there is no evidence that blink-182 exercised control over Robinson.

Changing course, Darago asserts agency by estoppel, which "allows a principal to be vicariously liable for the torts of an independent contractor." *Brown-Spurgeon v. Paul Davis Sys. of Tri-State Area, Inc.*, No. CA2012-09-069, 2013 WL 1883214, at *5 (Ohio Ct. App. May 6, 2013). An agency by estoppel is created "only where the principal holds the agent out as possessing authority to act on the principal's behalf, or the principal knowingly permits the agent to act as though he had such authority." *McSweeney v. Jackson*, 691 N.E.2d 303, 307 (Ohio Ct. App. 1996) (citation omitted). To prevail, Darago must show that (1) blink-182 "made representations leading [him] to reasonably believe that [Robinson] was operating as" blink-182's agent; and (2) that he "was thereby induced to rely upon the ostensible agency relationship to his . . . detriment." *Brown-Spurgeon*, 2013 WL 1883214, at *5; *see also Albain v. Flower Hosp.*, 553 N.E.2d 1038, 1049 (Ohio 1990), *overruled on other grounds by Clark v. Southview Hosp. & Fam. Health Ctr.*, 628 N.E.2d 46, 48–50 (Ohio 1994). Darago fails to make that showing.

Darago claims that he believed Robinson was acting as blink-182's agent when he instructed Darago and Tussey to allow crowd surfing. But Darago has not shown that he

*reasonably* relied upon any agency relationship that might have existed. Even if Robinson instructed Darago to allow crowd surfing, Darago's reliance on that instruction could not have been reasonable because he was Live Nation's employee, not blink-182's. Neither blink-182 nor Robinson had any authority to order any Live Nation employees, like Darago, to allow crowd surfing despite Live Nation's ban on that conduct. If there is fault here, it lies with Live Nation, whose Security Manager, Taylor, allegedly instructed Darago to "let 'em have fun," in violation of its anti-crowd surfing policy. Darago was justified in relying on the instructions from his own boss; but Live Nation has been dismissed from this suit, and Darago does not appeal that judgment. Darago, therefore, fails to establish agency by estoppel.

In sum, blink-182 cannot be held vicariously liable for Robinson's acts.

### B. Negligent Hiring and Supervision

To prevail on a negligent hiring or supervision claim under Ohio law, Darago must establish five elements: "(1) [t]he existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Zanni v. Stelzer*, 880 N.E.2d 967, 969 (Ohio Ct. App. 2007) (quotation marks omitted) (alteration in original).

The parties focus primarily on the first element. They assume, as did the district court, that Darago's negligent hiring and supervision claims fail if Robinson was an independent contractor. But that position misstates Ohio law. "[A]n employer may be directly liable for injuries resulting from its own negligence in selecting or retaining an independent contractor." *Albain*, 553 N.E.2d at 1044. It is, therefore, "irrelevant if the worker is classified as an employee or an independent contractor." *Jackson v. Hogeback*, No. CA2013-10-187, 2014 WL 2742945, at *7 n.5 (Ohio Ct.

App. June 16, 2014).  So long as "some sort of employment relationship existed, regardless of its type," Darago can meet the first element of his negligent hiring and supervision claims.  *Id.*

Yet Darago's claims still fail.  To show negligent hiring, a plaintiff must provide evidence that an employee "had a past history of criminal, tortious, or otherwise dangerous conduct about which the [employer] knew or could have discovered through reasonable investigation."  *Byrd v. Faber*, 565 N.E.2d 584, 590 (Ohio 1991); *see also Groner v. deLevie*, No. OOAP-1244, 2001 WL 438701, at *7 (Ohio Ct. App. May 1, 2001).  Darago provides no evidence that Robinson had a history of tortious or criminal conduct when he was hired; *a fortiori*, he cannot show that blink-182 was aware of any unsavory propensity at that time.  This theory, therefore, cannot survive summary judgment.

Darago presents a more developed theory of negligent supervision, but it also fails.  Darago's theory goes like this:  blink-182 must have been aware of the crowd surfing because it was occurring in front of the band while it played.  Robinson was responsible for the crowd surfing because he allegedly told Darago and Tussey to permit it.  So blink-182 behaved negligently by failing to correct Robinson's behavior during the concert.  The flaw?  Darago provides no evidence that blink-182 was aware of Robinson's alleged instruction to Darago and Tussey.  The mere fact that blink-182 saw crowd surfing—which Live Nation was responsible for managing—would not have put the band on notice that Robinson was facilitating it.  Absent proof that blink-182 was aware of any negligent conduct by Robinson, Darago's claim fails.  *See Groner*, 2001 WL 438701, at *8.

### C.  Premises Liability

"[T]o have a duty to keep premises safe for others" under Ohio law, "one must be in possession and control of the premises."  *Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 704

(Ohio 1995). Possession and control means having "the power and right to admit people to the premises and to exclude people from it, and involves a substantial exercise of that right and power." *Id.* (quoting *Wills v. Frank Hoover Supply*, 497 N.E.2d 1118, 1120 (Ohio 1986)).

Darago believes that blink-182 "had the authority to seek removal of a Live Nation employee or a guest if [they] had a problem with the employee or the guest." Therefore, Darago says, blink-182 controlled Blossom. But the record belies the claim. Blink-182 was "responsible for the production of the performance itself, while Live Nation [was] responsible for the operation of the venue," including "crowd management and security." Although blink-182 could "make requests to Live Nation to facilitate the production of [their] performance, . . . all venue operations, including crowd management and security," were ultimately at the discretion of Live Nation. Blink-182 confirmed that they did "not own, possess, control, and/or operate Blossom" and that they were required "to abide by Live Nation's venue policies and rules, including the prohibition of crowd surfing." Darago relies almost exclusively on Robinson's purported authority to "request a relocation of" security staff and "the ejection of crowd surfers." But, even if Robinson were the band's agent, Darago offers no authority suggesting that the mere ability to *request* the removal of an individual is sufficient control for purposes of premises liability. On this record, there is no question that the ultimate authority to admit or remove people from the premises rested solely with Live Nation.

Darago also argues that Robinson "instructed pit crew members to allow crowd surfing" and that Taylor acquiesced to this request. But this is not evidence of an ability to admit or exclude people from Blossom. As a last resort, Darago also claims that blink-182 had control, at the very least, over the pit. But the pit, like the rest of Blossom, is operated by Live Nation. And even then, Darago has pointed to no evidence suggesting that blink-182 had any unique ability to admit

or exclude people from the pit. In short, blink-182 did not control Blossom, which is fatal to Darago's premises-liability claim.

*  *  *

We AFFIRM the district court's judgment.